# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

**People v. Hughes, 2013 IL App (1st) 110237**

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. CAVINAUGH HUGHES, Defendant-Appellant. |
| District & No. | First District, Third Division<br>Docket No. 1-11-0237 |
| Filed | December 18, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Defendant's convictions for two murders were reversed and the cause was remanded for a new trial, since defendant confessed to both murders following intensive custodial interrogation, he was 19 years of age, he only attended school through the ninth grade, he got low grades, he had substance abuse problems, he smoked marijuana in the course of his questioning, he had juvenile arrests but little experience with the criminal justice system, his detention and interrogation over a period of 16 hours with little food, minimal sleep and the untruths told by his interrogators left him in a weakened condition, the coercive tactics used by the interrogators, including a polygraph test, contributed to his vulnerability, and under the totality of the circumstances, reversal and suppression were required, and on remand, if defendant is convicted, the trial court was directed to grant defendant credit for his presentencing custody starting in 2006. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, Nos. 06-CR-26159, 06-CR-26160 cons.; the Hon. John P. Kirby, Judge, presiding. |
| Judgment | Reversed and remanded. |

| Counsel on Appeal | Michael J. Pelletier and Nicole Marie Jones, both of State Appellate Defender's Office, of Chicago, for appellant. |
| | |
| | Anita M. Alvarez, State's Attorney, of Chicago (Michelle Katz and Janet Mahoney, Assistant State's Attorneys, of counsel), for the People. |
| | |
| Panel | PRESIDING JUSTICE HYMAN delivered the judgment of the court, with opinion. |
| | Justice Pucinski concurred in the judgment and opinion. |
| | Justice Mason dissented, with opinion. |

**OPINION**

¶ 1    Nineteen-year-old Cavinaugh Hughes confessed to two murders while subjected to intensive custodial interrogation. Hughes does not challenge the voluntariness of one of the confessions, but he contends that the other, a later confession, should have been suppressed as a product of coercion given the totality of the circumstances.

¶ 2    There is nothing more damning than a confession. Its effect has been described as "incalculable." *People v. Miller*, 2013 IL App (1st) 110879,¶ 82. Indeed, confessions constitute the strongest possible evidence the State may offer in the course of a criminal case. And because of the unparalleled weight accorded confessions in our legal system, courts should closely scrutinize confessions, especially, where, as here, police give false assurances to a vulnerable accused during a polygraph exam, and, at trial, the prosecution presents weak corroborative evidence.

¶ 3    Despite the unreliability of polygraphs as a matter of law (*People v. Taylor*, 101 Ill. 2d 377, 391 (1984)), police still use them to elicit confessions. And they do so with few safeguards or restrictions other than the requirement of voluntariness, which is primarily a question of fact falling on the State to prove beyond a reasonable doubt.

¶ 4    We watched the video recording of Hughes' interrogation from start to finish. Our bird's-eye view of what occurred before the first confession and, more tellingly, between the time of the first confession and the second confession, raises intolerable doubts about the validity of the second confession. The methods the detectives used during the interrogation process contaminated this confession. The totality of the circumstances underlying Hughes' second confession establish that he lacked the ability to make a rational, unconstrained decision to confess. Accordingly, we reverse and remand for a new trial.

BACKGROUND

¶ 6 The Murders

¶ 7 Much of the following narrative is adduced from the trial testimony of Dorian Skyles, a prosecution witness who testified in exchange for a plea deal.

¶ 8 A rumor started by a grandchild of Elijah Coleman's sister had it that Coleman won the lottery. Joshua Stanley, who attended school with the grandchild, heard the rumor and came up with a plot to steal the money. On November 18, 2005, Stanley and one of Stanley's friends met another friend, Dorian Skyles, at an apartment Skyles shared with his girlfriend, Jetun Coburn. Stanley asked Skyles for a gun to use in the robbery, claiming the lottery winnings were kept in a safe at Coleman's house where the 68-year-old Coleman lived with his sister and her grandchildren. Skyles called defendant Cavinaugh Hughes and told him to come to the apartment. Hughes arrived with another person, and Skyles gave Stanley and Hughes revolvers.

¶ 9 Around 10:30 or 11 p.m., Skyles and Coburn left the apartment in Skyles' car, and Hughes, Stanley, and two other people left in Hughes' car. The group headed over to Coleman's house, a distance of about six blocks. Skyles parked on the street. Hughes parked in the alley behind the house. Stanley, Hughes, and the two others approached the front door, and within moments, Skyles heard a gunshot. About 5 or 10 minutes later, Skyles heard another gunshot.

¶ 10 Skyles then saw Stanley, Hughes, and the two others run from the house. Skyles and Coburn immediately drove to their apartment. Soon after arriving there, Hughes called Skyles, hysterical, saying that Stanley had shot Coleman.

¶ 11 The next day, November 19, Skyles called Hughes, and said, "[W]e need to find [Stanley]." Hughes and another friend, Cordell Matthews, went to Skyles' apartment, at which time, according to Skyles, Hughes told him he shot Coleman in the legs and that shortly afterwards Stanley shot Coleman in the head. Then, Skyles and Coburn in one car, and Hughes in Coburn's Chevrolet Impala, drove around the neighborhood looking for Stanley. At some point, Hughes switched the license plates on the Impala with temporary plates registered to his car.

¶ 12 Skyles found Stanley, told him they needed to talk, and drove Stanley to Coburn's apartment. Hughes and Matthews joined them. As they drank alcohol and smoked marijuana, they discussed the robbery and shooting. Skyles testified that he and Hughes spoke privately, and, again according to Skyles, Hughes confided in Skyles that he planned on killing Stanley.

¶ 13 Later that day Skyles told Stanley to get into the Impala with Hughes. A short time later, Hughes called Skyles to tell him he had lost the keys to the Impala, and Skyles should come and get him. Skyles picked up Hughes, who told him he had shot Stanley. About a block away, Skyles saw the Impala parked in an alley with police officers on the scene. The police found Stanley in a nearby gangway and transported him to a hospital where he died.

¶ 14 Hughes left for Michigan the next day. Skyles and Coburn reported the Impala stolen. The police, however, did not believe their story and questioned Skyles and Coburn about the murders. Skyles struck a deal with prosecutors and agreed to testify against Hughes. Skyles, in exchange for a plea to a lesser offense and reduced sentences, pleaded guilty to two counts

of home invasion and conspiracy to commit first degree murder, for which he received concurrent sentences of 17 and 7 years.

¶ 15                          Hughes' Arrest and Interrogation

¶ 16    Eleven months after the murders, Hughes was arrested in Michigan. On October 26, 2006, Chicago police detectives Ford and Lazarra went to Kalamazoo County, Michigan, to return Hughes to Chicago. About 2 p.m., the detectives read Hughes his *Miranda* rights. Hughes indicated he understood his rights and wished to make a statement. The detectives instructed Hughes to wait, handcuffed Hughes' hands behind his back, and drove to Chicago. Hughes did not talk about the murders during the ride. But he did complain about the tightness of the handcuffs and asked that he be handcuffed with his hands in front to alleviate the pain. The detectives refused Hughes' request.

¶ 17    When they arrived at the station, Hughes was placed in a room equipped with an audio-video camera. At about 3:30 p.m., with the audio-video recording, Detectives Ford and Brannigan sat down with Hughes. Almost immediately, Hughes asked the detectives to remove the handcuffs and expressed relief when they did. The detectives then left Hughes alone for about 45 minutes.

¶ 18    When the detectives returned, they took Hughes to use the restroom. Back in the interrogation room, Hughes was read his *Miranda* rights for the second time and was asked whether he understood his rights and would answer questions. Hughes responded "yeah" to both inquiries.

¶ 19    Periodically throughout the interrogation, the detectives provided Hughes with cigarettes.

¶ 20    Hughes claimed to have been standing outside Coleman's residence when Skyles shot Coleman in the legs and Stanley shot Coleman in the head, and that Skyles later killed Stanley to prevent him from going to the police. Hughes claimed he acted only as a lookout for the robbery of Coleman. The detectives left again at 4:39 p.m.

¶ 21    When the detectives returned some 4 hours and 40 minutes later, Hughes repeated the story. He further claimed that he was not in on planning Stanley's murder. The detectives pressed Hughes, and at about 9:30 p.m. he recanted, admitted he knew of the plan to kill Stanley, but claimed he did not know when and where it would occur. Hughes also admitted he was angry with Stanley and wanted Stanley dead for shooting Coleman. Hughes denied disposing of the gun that was used to shoot Stanley.

¶ 22    Around 10:40 p.m., Hughes agreed to provide a DNA sample. After taking Hughes to use the restroom, the detectives left him alone in the interrogation room until 11:22 p.m. During that 42-minute interval, Hughes sat, paced, and got a bit of sleep. This time when the detectives returned, they gave Hughes a soft drink and read him his rights regarding the DNA sample. An evidence technician took a swab from Hughes' cheek. The detectives and the technician left Hughes alone again.

¶ 23    At 11:46 p.m., the detectives returned. Hughes repeated his story a third time. The detectives continued questioning Hughes. Around 12:21 a.m., following a question about whether he disposed of the gun used to kill Stanley, Hughes asked:

"[Hughes]: Well, when did my grandfather die, man?

[Detective]: I don't know the exact day, but a few months ago.

[Hughes]: Was he dead in his crib?

[Detective]: He died at home, yeah.

[Hughes]: He died at home. Peaceful though?

[Detective]: Yes.

[Hughes]: Man, after we left, man, I dumped it. I dumped the three fifty-seven [revolver]. I broke it down at my house, wrapped it up in a sock man and I threw it in the river, man. I threw it in the river by the border going towards Indiana."

¶ 24    After this admission, Hughes still maintained Skyles shot Coleman in the legs and killed Stanley. The detectives again asked if Hughes shot Coleman. Again Hughes denied it, telling the detectives, "Man, though like if y'all whatever man *** court people look at me for that old man G, that's why I was mad, man. I did not do shit to that old man. My grandfather, man, shit, I just found out yesterday." The detectives asked about the identity of the two others who participated in the robbery. Hughes denied knowing their names, but said about Stanley:

"[Hughes]: *** That n***a [Stanley] had no business whacking that old man for no reason at all even after Dough [Skyles] shot that n***a [Coleman] in the leg. After Dough [Skyles] shot him in the leg it wasn't even–wasn't even–got to do shit else to him. He was down.

[Detective]: Well, you know what the fatal shot to that old man, was the leg shot. He bled to death.

[Hughes]: But he got shot in the head though.

[Detective]: It went through the cavity and ended up in his mouth. That did not kill him. It's fucked up, uh?

[Hughes]: Hell yeah that's fucked up. That's bogus. And I don't be–I don't even be praying everyday for me to get me out of trouble, G. I pray everyday for that old man, Joe, straight up man. I loved my grandfather, Joe, I would have never–I would never got down like that. Straight up, man.

[Detective]: You were pretty pissed at Josh [Stanley], uh?

[Hughes]: Man, I was mad as hell."

At trial, the parties stipulated that Coleman died of "multiple gunshot wounds," not of any specific wound.

¶ 25    The detectives left Hughes at 12:38 a.m. While alone, Hughes smoked, paced, and talked to himself, mumbling "It's over man. *** They know everything." He spoke aloud to his dead grandfather, "Man, Pops, your ass dying on me, man. I sure needed you during this shit, man," and "You disappointed in me right now, you know. Man, I started out as your everyday school boy. Ain't nobody loved me, Jesus. Man, outta here, fool. It's over." (Hughes argues he said "Everybody loved me" rather than "Ain't nobody loved me, Jesus." The transcript does not clarify this.) Around this time, Hughes pulls some kind of cigarette

out of his underwear and rolls it. At 12:54 a.m., the detectives returned, and the interrogation continued,

"[Detective]: We came to an understanding here, right? You're not going to bullshit me no more? Here's–there's only one thing I have an issue with. Okay. And that's with who shot Josh [Stanley]. Okay. You're just–you're getting charged with the same thing regardless, okay.

[Hughes]: For both of them?

[Detective]: Well, we'll see. But now here's the deal. I'm willing to tell you right now that I believe you when you tell me you did not shoot the old man. Okay. And there's where we're going to let it out you said you did not shoot the old man, but I know that pissed you off to no end because of your grandfather, right? Now Josh stole the last couple of months of your life away from spending it with your grandfather and you're fuckin' pissed. I know you were pissed. You were the one that changed the plate on the car, you were the one that ended up with the gun, and you told Cordell that you shot Josh. *** You know that we have other information that there's other people looking out their windows and shit and you and Dough [Skyles] look nothing alike. *** You're–you're heavy and he's skinny.

[Hughes]: I shot Josh [Stanley]."

¶ 26 After 9½ hours, Hughes confessed to killing Stanley. He still insisted, however, that Skyles shot Coleman in the legs. The detectives questioned Hughes some more, and left at 1:04 a.m.

¶ 27 While the detectives were out of the room, Hughes can be seen mumbling to himself and pacing. The detectives came back at 1:22 a.m. with a sandwich and another soft drink for Hughes, and left.

¶ 28 At 1:35 a.m., the detectives returned and requestioned Hughes about the shooting of Coleman in the legs. Hughes denied he shot Coleman. The detectives asked Hughes if he would be willing to sit for a polygraph examination. Hughes consented. The detectives said the polygraph would be given in the morning. They gave Hughes a lit cigarette and left.

¶ 29 While Hughes paced, he reached inside his pants and carefully rolled, lit, and smoked something, which he finished shortly after 2 a.m. Then, lying on a cot, he appears to close his eyes and sleep.

¶ 30 Less than a half hour later, the detectives reentered the room and turned on the lights, and the following conversation took place:

"[Detective]: Change of plans bro, get dressed.

[Hughes]: Can I get a square, Joe?

[Detective]: Yeah.

[Detective]: What the fuck were you doing in here?

[Hughes]: Uh.

[Detective]: You're smoking in here now that we're all sitting in here smoking. What were you smoking? Buds [marijuana]?

[Hughes]: Yeah, smoking buds.

[Detective]: How did you get it lit?

[Hughes]: Off the one [cigarette] I had. Just kept smoking till I fell to sleep. That's the last one I had right there."

¶ 31    The detectives handcuffed Hughes before taking him for the polygraph exam. Hughes arrived at the polygraph examiner's office and the examiner, Detective Figueroa-Mitchell, read Hughes his rights, which he waived. She discussed the nature of the test and the importance of telling the truth. Several time Figueroa-Mitchell represented to Hughes that the polygraph was infallible:

• "[T]his is a genuine test. This is not a joke. We need to try to find the truth."

• "[R]emember when you were in school LB [Hughes] somebody said, 'Oh you got ninety-five on the test?' *** You passed, that's an A, right? *** Okay. It's not an A because it's [a] polygraph. *** A polygraph, if it's not 100 percent, *** it's a failure. *** It's a straight failure. There's nothing you can do. We got to have the whole truth and nothing but the truth because that's the only way it's going to happen in this room if you pass."

• "If for any reason *** you can't be honest with yourself, you're going to have problems passing."

• "Scientists believe that certain things happen inside the body that no one can control because we're just human *** [a]nd when we happen to tell a lie our body has to kick in *** we call it the flight, fright and freeze."

She asked for his side of the story. Hughes repeated that Skyles shot Coleman in the legs: "Man, Dorian [Skyles] was the first person in. He shot–he shot him [Coleman] in his legs."

¶ 32    Figueroa-Mitchell examined Hughes from 3:35 a.m. to about 4:05 a.m. Three times during the test the detective asked, "Did you have a gun in that house?" to which Hughes answered "No." She left the room shortly after the test. Hughes sat, nodding off in his chair. Figueroa-Mitchell returned about 4:30 a.m. with a soft drink for Hughes.

¶ 33    Figueroa-Mitchell claimed the test revealed Hughes had consistently lied on one question ("I asked *** 'Did you have a gun in that house?' The whole test *** just dropped to the floor. I don't know why. I wasn't there, but according to this, it ain't truth."), and that this was his only opportunity to tell the truth. She spoke to him at length, and reiterated that showing remorse would benefit Hughes in the future:

"[Figueroa-Mitchell]: We're not trying to upset you up in here. We're trying to work it out and you just be as truthful as possible because if you don't be truthful it's only going to hurt you down the long run. Okay. 'Cause people want to know if he's an okay guy, is he a bad guy, was it a mistake, doesn't he have remorse, is he sorry? You know what they gonna say? He went to the lie box and he just kept lying. He never, ever told the truth. *** I'm–I'm fighting for you over here. *** I'm trying to get you to say 'I'm sorry.' And that is your beginning of what you got to see. It's the most important part right now. *** But if you not sorry about it, what you think is going to happen? It's going to be awful. You see what I'm saying? Everything going to get awful if there's no

-7-

remorse. You see what I'm saying? Because then they're gonna say–you know what, this guy he'll do it again *** I'm just asking you was this a mistake?

　　[Hughes]: Yeah."

Figueroa-Mitchell kept pressing Hughes. Around 4:53 a.m., Hughes explained:

　　"[Hughes]: It was suppose to be a younger guy. At the door it was suppose to be a younger man who answered the door. *** Dude sure, I mean [Stanley] was sure about it. And then he'll go to the door but he be having that gun, have it close to him all the time woo-woo-woo. So shit, [Stanley] had the gun. I had the gun. He opened the door. [Stanley] knocked on the door. You know what I'm saying? He was at the door. I ain't really–I ain't–I ain't see it was an old man 'cause [Stanley] was in front of it. You know. It was suppose to–It was suppose to–dude was suppose to be a young n***a coming to the door. When he came to the door he was suppose to have a gun, so I just was suppose to boom-boom two times in the leg. *** Then that was it."

¶ 34　　The polygraph examiner brought in the other detectives, and Hughes told them he shot Coleman in the legs. The polygraph video ends about 5 a.m. Hughes was returned to the interview room at 5:42 a.m.

¶ 35　　Hughes filed a motion to suppress the confession regarding the shooting of Coleman in the legs. After a hearing, Hughes' motion to suppress was denied. The trial court found Hughes was read his *Miranda* rights on three occasions: (i) before his extradition from Michigan, (ii) before his interrogation began in Chicago, and (iii) before the polygraph examination. As to the handcuffs, the trial court stated the detectives removed them in the interrogation room. The trial court, after reviewing the video recording of the interrogation and the transcript, found the detectives' testimony to be credible and no evidence of coercion.

¶ 36　　Hughes was convicted of two counts of first degree murder and sentenced to natural life in prison. This appeal followed.

¶ 37　　　　　　　　　　　　　ANALYSIS

¶ 38　　　　　　　　Confession Issue Preserved for Appeal

¶ 39　　The State asserts that Hughes forfeited review of the confession issue for purposes of an appeal, citing *People v. Coleman*, 129 Ill. 2d 321 (1989). We disagree.

¶ 40　　We find *Coleman* inapposite. Coleman was charged with the murder and aggravated kidnaping of a nine-year-old girl. *Id.* at 325-26. When questioned by an FBI agent, Coleman asserted his right to counsel. *Id.* at 340. Later that day, a local police officer questioned him, and he admitted to knowing the victim. *Id.* Coleman filed a motion to suppress his statements to the FBI agent, which the trial court granted, but he did not move to suppress his statements to the police officer. *Id.* The officer testified at trial about the statement, and Coleman objected on "foundational" grounds. *Id.* The trial court overruled the objection. On appeal, the court affirmed, holding that Coleman's failure to bring up the issue in his motion to suppress and properly object at trial constituted forfeiture through procedural default. *Id.* at 340-41.

¶ 41　　The State argues that Hughes, like Coleman, did not seek to suppress his statements on

-8-

the grounds that they were involuntary in light of his youth, lack of education, emotional distress, lack of sleep, and police deceptions. But, in *Coleman*, the defendant never mentioned in his written motion to suppress the issue of his statements to local police. Here, however, Hughes filed a written motion specifically setting forth his voluntariness arguments. Hughes urged that the detectives obtained the confession as a result of "psychological," "mental," and "physical coercion illegally directed against" him.

¶ 42    To preserve appellate review of an issue raised in a motion *in limine*, the defendant must include it in a posttrial motion. *People v. Hudson*, 157 Ill. 2d 401, 434 (1993). The defendant need not "state identical grounds for contesting the issue" but may raise the issue under similar theories. *People v. Hyland*, 2012 IL App (1st) 110966, ¶¶ 27-28 (holding related theories preserved for review by filing motion to quash arrest and suppress evidence). At the hearing on the motion to suppress, defense counsel focused on the detectives' interrogation of Hughes during the extradition. After trial, Hughes in his motion for a new trial argued, among other matters, that the trial court erred in denying his motion to suppress. At that hearing, defense counsel urged that Hughes made his statements in an attempt to please the detectives and that the detectives repeatedly lied to him to coerce his statements. These arguments preserve the issue of the voluntariness of Hughes' confession.

¶ 43    The dissent argues that Hughes forfeited the issue of voluntariness when his counsel stated, before the hearing on his motion to suppress, that he would focus the evidentiary hearing on Hughes' interrogation while extraditing Hughes from Michigan. This does not amount to a forfeiture under the law. Forfeiture, "strictly defined," is the failure to make the timely assertion of the right. *Gallagher v. Lenart*, 226 Ill. 2d 208, 229 (2007). Forfeiture or procedural default prevents litigants "from asserting on appeal an objection different from the one" advanced in the trial court. *People v. Heider*, 231 Ill. 2d 1, 18 (2008). But "where the trial court clearly had an *opportunity to review the same essential claim* that was later raised on appeal, *** there was no forfeiture." (Emphasis added.) *Id.*

¶ 44    The trial court had an opportunity to review the same essential claim as Hughes presents to us. Hughes moved *in limine* to suppress his statements, arguing they resulted from "psychological," "mental," and "physical coercion illegally directed against" him. At the evidentiary hearing, the video of the interrogation became part of the record. In his oral ruling, the trial judge indicated that "[t]he allegations in the complaint are that there was physical, mental coercion," and then the judge addressed whether the manner in which Hughes was handcuffed amounted to coercion. The trial judge denied the motion to suppress, finding "no evidence of any physical coercion" or "violations of his [Hughes'] Fifth or 14th Amendment [rights]."

¶ 45    Hughes moved for a new trial based partly on the denial of his motion to suppress. This time Hughes argued that (i) he tried to please the detectives during his interrogation; (ii) the detectives lied to induce him to confess; and (iii) his youth and the duration of the interrogation coerced him into confessing.

¶ 46    We believe these two motions and hearings confirm that the trial court had every opportunity to meaningfully review and rule on the same essential claim raised on appeal, namely, involuntariness. Thus, we find no forfeiture.

¶ 47 Even if we were to find forfeiture, the plain error doctrine permits us to "by-pass normal rules of forfeiture and consider '[p]lain errors or defects affecting substantial rights *** although they were not brought to the attention of the trial court.' " *People v. Eppinger*, 2013 IL 114121, ¶ 18 (quoting Ill. S. Ct. R. 615(a)). Plain error review applies in two circumstances: (i) when "a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error"; or (ii) when "a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *Id.*

¶ 48 The first step involves determining whether a clear and obvious error occurred. *Id.* ¶ 19. As evident from our analysis below, based on the totality of the circumstances, the admission of Hughes' statements regarding the murder of Elijah Coleman falls within the realm of a clear and obvious error. *Infra* ¶¶ 55-82. The second step involves determining whether the evidence presented at trial was closely balanced, which it is here. Hughes' confession played a critically important role in his conviction–no evidence directly linked Hughes to Coleman's death. Other than the confession, the evidence consisted of (i) the testimony of Skyles, who claimed he did not witness the shooting and, in exchange for a lighter sentence, testified that he heard Hughes admit to the shooting, and (ii) the testimony of Matthews, who was not present during Coleman's murder and testified that he did not remember many of the conversations that implicated Hughes. Furthermore, until the confession, Hughes repeatedly denied shooting Coleman and maintained that Skyles shot Coleman. As such, the evidence against Hughes consisted almost entirely of his confession. *People v. Patterson*, 2012 IL App (1st) 101573, ¶ 41 ("Because confessions have such persuasive effect as evidence of guilt, the erroneous admission of a confession into evidence rarely constitutes harmless error.").

¶ 49 Voluntariness of Confession

¶ 50 Hughes argues that the trial court erred in denying his motion to suppress his confession that he shot Coleman. In support, Hughes cites lack of sleep, lack of education, his youth, his emotional distress over learning of his grandfather's death, and the deception and trickery used by the police. After taking into consideration the totality of the circumstances, as we must, we do not believe Hughes' confession was freely and voluntarily made.

¶ 51 "In reviewing a trial court's ruling concerning whether a confession is voluntary, the trial court's factual findings will be reversed only if those findings are against the manifest weight of the evidence. [Citation.] Ultimately, however, the trial court's ruling on whether the confession was voluntary is subject to *de novo* review." *People v. Murdock*, 2012 IL 112362, ¶ 29; *In re G.O.*, 191 Ill. 2d 37, 50 (2000). Illinois courts examine confessions "solely in the light of the voluntary-involuntary test." (Internal quotation marks omitted.) *People v. Willis*, 215 Ill. 2d 517, 524 (2005). " 'A confession is voluntary if it is the product of free will, rather than the product of the inherently coercive atmosphere ***.' " *In re Marquita M.*, 2012 IL App (4th) 110011, ¶ 22 (quoting *People v. Nicholas*, 218 Ill. 2d 104, 118 (2005)). Thus, the confession must be the product of a free and unconstrained choice of its maker.

¶ 52 The totality of the circumstances determines voluntariness. *People v. Armstrong*, 395 Ill.

App. 3d 606, 624 (2009). The inquiry "examines 'whether a defendant's will was overborne' by the circumstances surrounding the *** confession." *Dickerson v. United States*, 530 U.S. 428, 434 (2000) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973)). This "determination 'depend[s] upon a weighing of the circumstances of pressure against the power of resistance of the person confessing.' " *Id.* (quoting *Stein v. New York*, 346 U.S. 156, 185 (1953)). Factors considered include: (i) the defendant's age, intelligence, education, experience, and physical condition at the time of the detention and interrogation; (ii) the duration of the interrogation; (iii) the presence of *Miranda* warnings; (iv) the presence of any physical or mental abuse; and (v) the legality and duration of the detention. *People v. Harris*, 2012 IL App (1st) 100678, ¶ 63. The State bears the burden of establishing voluntariness by a preponderance of the evidence. *People v. Harbach*, 298 Ill. App. 3d 111, 117 (1998). The court may also consider the investigator's fraud, deceit, or trickery in obtaining a confession (*People v. Bowman*, 335 Ill. App. 3d 1142, 1153 (2002)), and threats or promises made to the defendant (*People v. Richardson*, 234 Ill. 2d 233, 253-54 (2009)).

¶ 53    Deception can compromise a defendant. In *People v. Eckles*, for instance, the defendant came to the police station to answer questions regarding a burglary. *People v. Eckles*, 128 Ill. App. 3d 276, 277 (1984). A police officer told the defendant (a 19-year-old with tenth-grade education) that "it would be in [the defendant's] best interests to get the truth out as fast as possible," and that "if he told the truth and cooperated, [the officer] would inform the State's Attorney and testify in court as to the defendant's cooperation." *Id.* The officer also said that a witness had identified the defendant as involved. *Id.* at 279-80 (Alloy, P.J., dissenting). After only 25 to 35 minutes of questioning, the defendant confessed to the burglary. *Id.* at 279 (majority opinion). At the suppression hearing, the defendant testified that he admitted to the burglary so that the officer "might help make things go easier for him." *Id.* at 280 (Alloy, P.J., dissenting). The trial court noted that the question of voluntariness was "extremely close," but concluded that the statement was voluntary. On appeal, a divided panel affirmed, finding that the totality of the circumstances did not indicate that the defendant's will was overcome. *Id.* at 279 (majority opinion).

¶ 54    Courts have a long-standing mistrust of extrajudicial confessions because "confessions are unreliable if coerced; and, for various psychological reasons persons 'confess' to crimes that either have never occurred or for which they are not legally responsible." (Internal quotation marks omitted.) *People v. Rivera*, 2011 IL App (2d) 091060, ¶ 40. " '[U]ntrue confessions may be given to gain publicity, to shield another, to avoid apparent peril, or for other reasons.' " (Internal quotation marks omitted.) *Id.* (quoting *People v. Lambert*, 104 Ill. 2d 375, 380 (1984)). An innocent person may confess from "fatigue, stress, and being worn down through relentless questioning and sleep deprivation; some people confess out of fear; some people confess with the expectation of future exoneration; some people confess due to coercive or suggestive methods of interrogation." *Id.* (citing Saul M. Kassin, *Inside Interrogation: Why Innocent People Confess*, 32 Am. J. Trial Advoc. 525 (2009)). "False confessions are more common than sometimes believed, and standard interrogation techniques designed to elicit confessions–including the use of false claims that the investigators have definitive evidence of the examinee's guilt–do elicit false confessions." National Research Council, Committee to Review the Scientific Evidence on the Polygraph

*et al.*, The Polygraph and Lie Detection 56 (2003), *available at* http://www.nap.edu/catalog.php?record_id=10420.

¶ 55        Hughes was 19 years old at the time of the interrogation. He attended school through the ninth grade, and received C's and D's. He used marijuana five to six times a day and drank several glasses of cognac twice a week. His arrests as a juvenile involved unlawful use of a weapon and criminal trespass to a vehicle. Hughes argues that his lack of education, regular substance abuse, and minimal experience with the criminal justice system contributed to the involuntariness of his confession.

¶ 56        Hughes' age, intelligence, education, experience, and physical condition at the time of the detention and interrogation address his character and capacity to resist police coercion. Courts recognize that youth, education, and experience increase susceptibility to police coercion. We agree that Hughes' youth (Hughes was 19 years old at the time of interrogation) and lack of education (Hughes only attended school to the ninth grade) heightened his vulnerability to the coercive tactics used on him. See *People v. Starling*, 64 Ill. App. 3d 671, 675 (1978) (suppressing statement of inexperienced 18-year-old defendant); *People v. Braggs*, 209 Ill. 2d 492, 519 (2003) ("Custodial interrogation trades on the weaknesses of individuals [citation]; the young and mentally infirm are most vulnerable."). Also, nothing in the record indicates that Hughes ever had a meaningful interaction with the criminal justice system, such as undergoing an interrogation and suffering the consequences of his statements. *People v. Johnson*, 208 Ill. 2d 53, 99 (2003) ("it is the experience of giving up rights and actually suffering consequences as a result thereof that causes people to comprehend the significance of those rights").

¶ 57        The dissent rejects the notion that Hughes' youth and education made him more susceptible to coercion. In support, the dissent cites Hughes' ability to read aloud and properly pronounce complex multisyllabic words and phrases contained in the written waivers ("constitutional," "judicial order," "biological evidence," etc.). Pronunciation is not a sign of one's intelligence or an indicator of one's ability to resist police coercion. See *State v. Skillicorn*, 944 S.W.2d 877, 889-90 (Mo. 1997) (noting defendant's inability to pronounce "coercion" irrelevant). The dissent further argues that because Hughes understood the meaning of "accountability" he must have had sufficient experience with the criminal justice system to make his statement voluntary. Why would understanding the meaning of a single word convey experience with the criminal justice system? In fact, Detective Ford explained to Hughes the meaning of "accountability" early in the interrogation:

      "Well, let me explain something to you, okay. There's nothing to frame you on. Okay? Already, just your participation in the robbery and your participation in the planning of the murder makes you accountable. *You understand what accountability is? That means you're going to get charged whether or not you're the shooter or not.*" (Emphasis added.)

¶ 58        Moreover, that Hughes began his custody in the backseat of a car, handcuffed behind the back in an uncomfortable and painful position for at least 1½ hours typifies a coercive atmosphere. Detective Ford testified that Hughes, who was overweight, complained of the pain the handcuffs caused him. The State argues that the stress of the handcuffs does not

-12-

amount to physical coercion. We agree that alone the use of handcuffs is usually inconsequential. See *People v. Cukojevic*, 103 Ill. App. 3d 711, 720 (1981) ("the use of handcuffs is not coercive per se"). Yet, handcuffing a person in an uncomfortable position for a prolonged period serves to reinforce one's powerlessness and helplessness. And prolonged handcuffing that is unnecessarily uncomfortable may contribute to a coercive atmosphere.

¶ 59　As to the length of the interrogation, Hughes was picked up in Michigan around 2 p.m. and the interrogation ended around 6 a.m. the following day. Just over half of that time Hughes spent alone. Over the course of the interrogation, Hughes' clarity and cadence of speech, alertness, and concentration deteriorate. While in the afternoon he speaks freely, by the early morning hours before and during the polygraph examination Hughes mumbles several answers and appears exhausted.

¶ 60　Detective Ford told an obviously exhausted Hughes to sleep, and that he would take him for the polygraph in the morning. Ford returned 25 minutes later, announcing a "change of plans." Where the State presses an interrogation into the early morning hours, depriving an accused of sleep, it can intensify the coercive atmosphere. *People v. Travis*, 2013 IL App (3d) 110170, ¶ 64 (finding sleep deprivation caused by waking accused at night can lead to more coercive environment). Moreover, during the course of the interrogation, the detectives gave Hughes one sandwich and three soft drinks: a meager amount of food for a large person held for 14 hours.

¶ 61　Regarding physical or mental abuse, Hughes argues that the police took advantage of his distress on learning the day before that his grandfather had died. Hughes mentions his grandfather several times during the interrogation, and Coleman seems to remind Hughes of his grandfather. Though Hughes does not appear to be in emotional distress, he talks aloud to his late grandfather between interrogation sessions, indicating that he felt alone after his grandfather's passing. While Hughes was grieving during the interrogation, it is not clear that Hughes' grief had any impact on the voluntariness of his statements. See *People v. Ybarra*, 46 Ill. App. 3d 1049, 1051 (1977) (" 'It is to be expected that an accused charged with the crimes of murder and robbery might be apprehensive and under a certain amount of emotional stress; however, we cannot say that because defendant was crying he could not freely and voluntarily confess to the crimes.' " (quoting *State v. Jones*, 545 P.2d 323, 326 (Kan. 1976))).

¶ 62　Hughes also cites his regular drug use (smoking five or six joints a day, and drinking four or five glasses of cognac twice a week) to show involuntariness. See *People v. Kincaid*, 87 Ill. 2d 107, 117 (1981) ("A confession which is, in fact, induced by the administration of a drug, whether the drug is self-administered or otherwise, is involuntary and, thus is inadmissible into evidence." (Emphasis omitted.)). While nothing indicates that Hughes confessed as a result of any withdrawal effects (*e.g.*, *People v. Brown*, 172 Ill. 2d 1, 28 (1996) ("defendant did not show symptoms of undergoing cocaine withdrawal, nor did defendant ever mention that he was ill")), he did smoke marijuana immediately before the polygraph exam.

¶ 63　Neither the State nor Hughes' counsel had mentioned the use of marijuana by Hughes

before he took the polygraph test. The State filed a motion after oral argument for leave to cite additional authority, which we allowed, citing cases holding that a reviewing court "should not normally search the record for unargued and unbriefed reasons to *reverse* a trial court judgment." (Emphasis added.) *Saldana v. Wirtz Cartage Co.*, 74 Ill. 2d 379, 386 (1978). The dissent echoes this sentiment. But the reason to reverse–the involuntariness of the confession–Hughes himself raised in the first instance before the trial court and before us in his opening brief. Thus, Hughes framed the issue by both arguing and briefing the involuntariness of the confession as the reason for reversal. What the State tries to characterize as a reason to reverse does not constitute a reason at all but merely embodies an additional evidentiary basis in the record bearing on the reason. There is nothing extraordinary or irregular about that. *People v. Alfaro*, 386 Ill. App. 3d 271, 290 (2008) ("[t]he ultimate question of whether suppression is warranted is reviewed *de novo*. [Citation.] Further, in reviewing the trial court's ruling, a reviewing court may consider the *entire record*" (emphasis added)); *cf. Mitchell v. Toledo, Peoria & Western R.R. Co.*, 4 Ill. App. 3d 1, 3 (1972) ("although the entire record is available, the reviewing court is not *required* to search the record to find reason to reverse" (emphasis added)). Our *de novo* review of the record includes, as it should, viewing the entire video of Hughes' interrogation.

¶ 64　　Furthermore, though "normally" a reviewing court should avoid questions not presented by the parties, situations do arise where justice demands otherwise. *First Capitol Mortgage Corp. v. Talandis Construction Corp.*, 63 Ill. 2d 128, 133 (1976) (reviewing court not required to search record to sustain judgment, but may, either if justice requires, or where record is simple and claimed errors can be easily decided without aid of briefing); *Halpin v. Schultz*, 234 Ill. 2d 381, 390 (2009) (waiver "is an admonition to the parties rather than a limitation on a court of review"). Because defendant in the first instance raised the reason, we need not consider whether justice requires the court to raise *sua sponte* an unargued and unbriefed reason to reverse.

¶ 65　　The dissent essentially asks us to ignore the record, arguing that it is beyond our authority to view the interrogation video and decide what it shows, and that an evidentiary hearing should determine the contents of the video. While, in certain cases, the contents of a video recording may raise a question of fact (*e.g.*, *Commonwealth v. Huynh*, 895 N.E.2d 471 (Mass. 2008) (blurry, poor quality video created question of fact)), typically a hearing adds nothing of consequence regarding the contents of the video. Here both the video and transcript of the interrogation were introduced and authenticated as part of the record. See *People v. Tomei*, 2013 IL App (1st) 112632, ¶¶ 43-44 (finding admissibility of video turns on its accuracy and reliability). When introduced by the State, a video and transcript are not considered hearsay (Ill. R. Evid. 802(d) (eff. Jan. 1, 2011)), and likened to in-court testimony. " 'It is well established that a taped conversation or recording, which is otherwise competent, material and relevant, is admissible so long as it is authenticated and shown to be reliable through proper foundation. [Citation.] A taped conversation is not hearsay; rather, it is a 'mechanical eavesdropper with an identity of its own, separate and apart from the voices recorded.' [Citation.]" *People v. Theis*, 2011 IL App (2d) 091080, ¶ 32.

¶ 66　　Moreover, reviewing courts frequently view video on appeal and interpret its contents without the aid of the trial court. For example, in *People v. Woods*, the defendant confessed

to participating in a double murder. *People v. Woods*, 184 Ill. 2d 130, 132 (1998). The defendant moved to suppress his confession, alleging that the police beat it out of him. *Id.* at 133. At the hearing, the defendant presented evidence, including video and photographs of the beating. The trial court denied the motion to suppress, (*id.* at 139-45) the Illinois Supreme Court reversed. Significantly, the supreme court viewed one of the videos of the defendant's statements and found, "although the State introduced the post-confession videotape \*\*\*, *this black-and-white videotape is inconclusive*, as the camera angle and the positioning of defendant does not afford the viewer an opportunity to assess defendant's condition." (Emphasis added.) *Id.* at 149. The court's conclusion–that the tape was inconclusive on the question of the defendant's injury–is a finding allowed under a *de novo* review of the record. See also *People v. Traylor*, 331 Ill. App. 3d 464, 468 (2002) ("After viewing the photographs, *we find* that definite bruising was present on Traylor's nose in the September 25 photograph. Additionally, *we find* that such bruising was not present before Traylor's interrogation based on the testimony of every witness, including the investigators." (Emphases added.)); *People v. Hernandez*, 362 Ill. App. 3d 779, 785 (2005) (relying on "verbatim transcript" of confession made from video). Viewing and interpreting this type of evidence does not require the superior position of the trial court as with live witnesses, and, therefore, entitled to no deference. See *People v. Oaks*, 169 Ill. 2d 409, 447-48 (1996) (where record contains videotape and transcript of interrogation, so that neither facts nor credibility of witnesses is in issue, voluntariness of defendant's statements is question of law reviewed *de novo*), *abrogated by In re G.O.*, 191 Ill. 2d 37, 50 (2000) ("we will review *de novo* the ultimate question of whether the confession was voluntary" regardless of whether video and transcript of interrogation are in record); *In re D.F.*, 201 Ill. 2d 476, 498-99 (2002) ("Under a manifest weight of the evidence standard, we give deference to the trial court as the finder of fact because it is in the best position to observe the conduct and demeanor of the parties and the witnesses and has a degree of familiarity with the evidence that a reviewing court cannot possibly obtain."). In this situation, our eyes are just as functional as the trial court's. Thus, review of Hughes' confession video does not constitute, as the dissent asserts, our taking on the role of fact finder.

¶ 67 The State argues that "it would have been impossible for [Hughes] to be under the influence of any substance at the time he spoke to the detectives in this case." The State and the dissent contend that this court could not conclude that Hughes smoked marijuana without further testimony from the detectives. The evidence at the motion hearing, however, belies the State's claim.

¶ 68 The State entered the video into the record and established its accuracy. As the video and transcript attest, Hughes indeed smoked marijuana while in custody, and Detective Ford knew it. We see Detective Ford come into the interrogation room, smell something, identify the smell as "buds," marijuana, and ask Hughes about it. Hughes readily admits to the possession and use of marijuana, yet Ford reacts so nonchalantly that one might think he had taken a whiff of a strong cologne. Ford's behavior is out of character for a law enforcement officer who has come across contraband in a custodial setting. Moreover, the circumstances before us are unique–a suspect in custody smoking marijuana immediately before taking a polygraph examination.

¶ 69    The dissent also takes issue with our conclusion that Hughes smoked marijuana before sitting for the polygraph, insisting that it might have been tobacco–an assertion that rewrites the evidence. The dissent readily admits that the video shows Hughes rolling something to smoke between interrogation sessions, and smoking it around 2 a.m. Had Hughes been hiding tobacco in his underwear, why would Detective Ford have reacted to the smell on entry to the interrogation room? Why would Ford ask Hughes to identify the smell, as Ford too had been smoking tobacco with Hughes throughout the interrogation? Ford enters the room to take Hughes for polygraph testing and asks "What the fuck were you doing in here? *** What were you smoking? Buds?" "Buds" is a common slang term for marijuana. Watching the video and reading the transcript leaves no doubt that Hughes smoked marijuana before the polygraph.

¶ 70    Moreover, to reach the conclusion that Hughes smoked tobacco, the dissent edits the transcript, changing "buds" to "butts" among other things; a transcript which the State created and entered into evidence. Reinterpretation is wholly improper, and the State would be estopped from such speculation. See *People v. Woods*, 214 Ill. 2d 455, 475 (2005) (party forfeits issues as to impropriety of evidence if party procures, invites, or acquiesces in its admission).

¶ 71    Under these unique facts, Hughes' marijuana use militates against a finding of voluntariness as it likely reduced his ability to resist the detectives' coercion. The dissent disagrees, though the State conceded at oral argument that, if Hughes smoked marijuana before confessing, it would make a difference in determining whether Hughes' confession was voluntary. Polygraphs, after all, measure psychological stress through cardiovascular and respiratory patterns. The dissent argues that there is no binding precedent stating that confessions made while under the influence of a controlled substance are "*per se* coerced." We agree. The test of whether intoxication alone will negate a waiver of rights presents a high bar: "The suppression of a statement is warranted if the evidence 'plainly shows that a suspect is so grossly intoxicated that he no longer has the capacity to knowingly waive his rights.' [Citation.]" *People v. Crenshaw*, 2011 IL App (4th) 090908, ¶ 18. But less than gross intoxication may still affect a person's will. *Cf. United States v. Montgomery*, 14 F.3d 1189, 1195 (7th Cir. 1994) ("when the interrogating officers reasonably should have known that a suspect is under the influence of drugs or alcohol, a lesser quantum of coercion may be sufficient to call into question the voluntariness of the confession" (internal quotation marks omitted)). Hughes' marijuana use immediately before his early morning polygraph militates against a finding of voluntariness, though it is not dispositive.

¶ 72    Hughes next cites a number of untruths told by the detectives during the interrogation. In limited circumstances, interrogators may use subterfuge in attempting to elicit a confession. But where the State extracts a confession using deceptive interrogation tactics calculated to overcome the defendant's free will, suppression may be appropriate. *People v. Bowman*, 335 Ill. App. 3d 1142, 1153 (2002). "A misrepresentation which prompts inculpatory statements is only one factor to be considered in determining the voluntariness of the resulting statements." *People v. Kashney*, 111 Ill. 2d 454, 466 (1986). Hughes cites numerous lies told by the detectives, which the State does not contest in its brief: (i) that his fingerprints were found at the scene; (ii) that numerous witnesses placed him at the scene;

(iii) that the leg wounds, and not the head wound, killed Coleman; (iv) that he had failed the polygraph; and (v) that the court needed to know Hughes was sorry for what he had done.

¶ 73   The detectives' claims of having nonexistent evidence is a common police strategy, and while falsified evidence raises concerns as to voluntariness of a confession, usually, courts go along with these ruses. While the false-evidence ploys may be disturbing contextually and cumulatively, Hughes' "failed" polygraph and being told after the polygraph that the court needed to know Hughes was sorry for what he had done, weigh the heaviest against voluntariness due to their proximity and causal connection to the confession.

¶ 74   Though it would surprise most laypersons, polygraph results are not admissible evidence due to their insufficient reliability and the possibility that they may be given extraordinary weight. *People v. Taylor*, 101 Ill. 2d 377, 392 (1984); *People v. Washington*, 363 Ill. App. 3d 13, 20 (2006). The use of polygraph evidence in a criminal trial constitutes reversible error (*People v. Kuhfuss*, 241 Ill. App. 3d 311, 317 (1993)), as its admission undermines the integrity of the judicial process (*People v. Rosemond*, 339 Ill. App. 3d 51, 59 (2003)). Deceptive use of polygraph "results" to procure a confession weighs against a finding of voluntariness. See *People v. Melock*, 149 Ill. 2d 423, 449-50 (1992) ("In light of defendant's steadfast denial of any involvement in the murder until confronted with the polygraph 'results,' we believe that [the] deception largely contributed to defendant's decision to inculpate himself.").

¶ 75   In the pretest interview, Detective Figueroa-Mitchell told Hughes that the polygraph was infallible (*e.g.*, " 'A polygraph, if it's not 100 percent, *** it's a failure.' "). *Supra* ¶ 31. When she later tells Hughes that he failed the polygraph ("I wasn't there, but according to this it ain't truth"), she cloaks herself with the imprimatur of certainty. Figueroa-Mitchell's deception is akin to confronting an accused with fabricated evidence to elicit a confession. See *State v. Craig*, 864 P.2d 1240, 1242 (Mont. 1993) ("The officers mislead defendant into believing that the results of the [polygraph] test were legitimate and admissible in order to induce a confession. *** [I]t is not acceptable to this Court for the police to use the results of a polygraph examination to tell a defendant that he lied in order to extract a confession."); *State v. Cayward*, 552 So. 2d 971, 974 (Fla. Dist. Ct. App. 1989) ("we think the manufacturing of false [scientific] documents by police officials offends our traditional notions of due process of law under both the federal and state constitutions"). Before being confronted with the polygraph results, Hughes denied shooting Coleman and insisted Skyles was the shooter.

¶ 76   Our courts long ago ruled that the polygraph has little place in the judicial process. *People v. Taylor*, 101 Ill. 2d 377, 392 (1984); Rachael Adelson, *The Polygraph in Doubt*, 35 Monitor on Psychology 71 (July 2004) (*available at* http://www.apa.org/monitor/julaug04/polygraph.aspx) ("Psychologists have repeatedly told U.S. courts that polygraph tests–popularly thought to reveal a person's truthfulness through assessment of physiological states–are theoretically unsound and not valid in assessing honesty."). Yet, it has remained a police ploy.

¶ 77   Basically, the results of polygraph exams have been so discredited that their introduction is barred in both criminal and civil proceedings. But that has not stopped its use as a tactic

to induce confessions. The exam also puts the defendant in a catch-22. The defendant is confronted with polygraph evidence which is misrepresented to be the absolute truth, and is then pressured to confess and confirm the "test results." The accused only later learns that the results are inadmissible due to their unreliability, and ironically must appear at trial to rebut a claim that he or she was coerced (even if the polygraph was the source of coercion). See *People v. Washington*, 363 Ill. App. 3d 13, 20 (2006) (polygraph evidence "may be admitted for the limited purposes of rebutting a defendant's claim that his confession was coerced").

¶ 78        Moreover Detective Figueroa-Mitchell, the polygraph examiner, repeatedly represented to Hughes that she was "here to help" him, and that if he did not show remorse for shooting Coleman, his situation would only get worse. She also told Hughes that she was "fighting" for him, and that–if he showed remorse for shooting Coleman–she would testify in court on his behalf.

¶ 79        The State argues that Hughes could have called Figueroa-Mitchell to the stand on his behalf at the sentencing hearing. This argument is unrealistic at best. The relationship between the accused and law enforcement is naturally hostile. It would be tremendously unlikely a defendant would call an investigating detective to testify on his or her behalf during sentencing, and this tactic strikes us not only as inadvisable, but ludicrous. Thus, Hughes' ability to summon the detective to the stand to testify as to Hughes' remorse does not cure the coercive nature of the lies told by Figueroa-Mitchell.

¶ 80        Looking at the totality of the circumstances, Detective Figueroa-Mitchell's trickery and its cumulative effect, along with Hughes' character and the circumstances of the interrogation, indicate that his confession to shooting Coleman was not voluntary. Hughes' confession occurred around 5 a.m., after being in custody since 2 p.m. the previous day. By the time of his confession, a visibly spent and drug-addled Hughes had eaten little. In this condition, Figueroa-Mitchell pressed Hughes to confess and apologize for shooting Coleman. She stated that he had "failed" the polygraph exam, that a confession would aid him, and that she would testify on his behalf if he showed remorse. Confessions, such as this, *always* follow "failed" polygraphs as opposed to one with "passing" results. It is one thing to use these tactics on an alert, sober individual. See *People v. Eckles*, 128 Ill. App. 3d 276, 279 (1984) (finding no coercion where 19-year-old accused questioned for 25 to 35 minutes using similar tactics). It is another entirely to use them on Hughes, considering the details of the interrogation, his age, inexperience, degree of maturity, drug usage, police trickery, and promises and inducements. Consequently, Hughes was susceptible to coercion, and more easily hoodwinked into ignoring or misunderstanding the consequences of his statements. At this point, even the most innocent person might doubt their memory.

¶ 81        The dissent takes issue with much of our analysis, but–like the State in its brief–never addresses the totality of the circumstances. No single factor is dispositive, and Hughes' conviction rests not on evidence adduced through police investigation, but rather, on a "confession" secured through pressure based on a dubious polygraph result. The dissent notes that this case is similar to *Eckles*, where the circumstances surrounding the confession were "extremely close." *Eckles*, 128 Ill. App. 3d at 280 (Alloy, P.J., dissenting). But the facts here are far more extreme than the facts in *Eckles*. In *Eckles*, the defendant was 19 years old

with a tenth-grade education, and confessed after hearing lies similar to those told to Hughes. See *id.* at 277-79 (majority opinion). Both cases involved an uneducated 19-year-old male. But the interrogation in *Eckles* lasted less than half an hour, while Hughes' interrogation occurred over the course of 16 hours, with little food, minimal sleep, and numerous untruths told by the investigating detectives. Had Hughes not used marijuana while in custody, the totality of the circumstances still would require reversal and suppression. But given that fact, which cannot be ignored, the involuntariness of Hughes' confession to shooting Coleman is even clearer. The use of an involuntary confession as substantive evidence of a defendant's guilt requires reversal. See *People v. Woods*, 184 Ill. 2d 130, 150 (1998).

¶ 82    The dissent suggests the evidence is not closely balanced because "Hughes and not his co-defendant Skyles, fled the Chicago area after the murders." *Infra* ¶ 140. But, Hughes, not Skyles, killed Stanley, and the murder of Stanley sheds no light on whether Skyles or Hughes shot Coleman. To repeat, Hughes told the detectives again and again that he did not shoot Coleman. Only after the coercive circumstances already described did he provide a confession.

¶ 83    The confession will be suppressed, and we reverse and remand for a new trial.

¶ 84                                    Presentence Custody

¶ 85    Hughes and the State agree that the trial court did not properly credit him for his presentence custody. Under the Unified Code of Corrections, "the offender shall be given credit on the determinate sentence or maximum term and the minimum period of imprisonment for time spent in custody as a result of the offense for which the sentence was imposed." 730 ILCS 5/5-4.5-100(b) (West 2010).[1] After the new trial, if he is convicted, the trial court should credit Hughes for his custody starting October 26, 2006 until sentencing, even if he receives a sentence of natural life in prison.

¶ 86                                         CONCLUSION

¶ 87    Accordingly, we reverse and remand for a new trial, and, if he is convicted, to credit Hughes for his presentence custody.

¶ 88    Reversed and remanded.

¶ 89    JUSTICE MASON, dissenting.

¶ 90    The grounds Hughes now urges on appeal for suppression of his confession to Coleman's murder have been forfeited. Because I find no error in the admission of Hughes' confession to shooting Coleman, I respectfully dissent.

¶ 91    Although the boilerplate motion to suppress filed in the trial court by defense counsel

---

[1]This subsection was amended from "time" to "the number of days" after Hughes was sentenced, among other amendments. Pub. Act 97-697 (eff. June 22, 2012).

urged every ground imaginable as a basis to suppress Hughes' confessions to both murders, defense counsel made clear prior to the suppression hearing that the basis upon which they were proceeding was that Hughes was not given *Miranda* warnings in Michigan and that on the ride from Michigan to Chicago, Detectives Ford and Lazzara interrogated him. This was the focus of the evidence presented to the trial court and, consistent with that evidence, the trial court made the factual findings and conclusions the parties requested it to address. Defendant does not take issue with those findings in this appeal.

¶ 92        Neither in the suppression hearing nor in the posttrial motion did counsel assert the bases for suppression of Hughes' confession to Coleman's murder now urged before us. The posttrial motion merely states, "[t]he court erred in denying the motion to suppress." Such a motion is no more informative or specific than one that claims the trial court "improperly instructed the jury" (but not identifying any particular erroneous instruction) or "abused its discretion in admitting evidence" (but failing to specify what evidence the court erred in admitting).

¶ 93        At the hearing on the motion, defense counsel, *on the issue of reasonable doubt*, argued only that "there were misstatements" (unspecified) and "based on the fact that Mr. Hughes was a very young person, just a teenager, and being pressured and held all night during the time he was giving the statements," Hughes' confession was *not reliable* and, therefore, the court should reconsider its finding of guilty. On this record, the conclusion that Hughes has forfeited the grounds now urged as bases to suppress his confession is unavoidable. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988); *People v. Bui*, 381 Ill. App. 3d 397, 405 (2008).

¶ 94        The arguments now advanced by Hughes on appeal are clearly not the "same essential claim" asserted by him in the trial court. Obviously, an evidentiary hearing in which the trial court is asked to resolve whether a defendant was given *Miranda* warnings prior to confessing is very different from one in which a defendant claims that during questioning following the waiver of *Miranda* rights, officers engaged in misconduct that resulted in a coerced confession. There is no apparent relationship between Hughes' claim that Detectives Ford and Lazzara failed to give him *Miranda* warnings at 2 p.m. in the afternoon–the ground upon which he proceeded with the suppression hearing–and his claim on appeal that another detective misled him more than 14 hours later.

¶ 95        The majority concludes that because (1) Hughes filed a pretrial motion to suppress his confessions listing a number of generic grounds (among them, "psychological," "mental," and "physical coercion"), (2) he filed a posttrial motion again containing a generic claim that the trial court erred in denying the motion to suppress, and (3) the videotape of his interrogation was introduced at the suppression hearing, he has the open-ended opportunity on appeal to argue anything, notwithstanding that the State–not to mention the trial court–was never given an opportunity to address or resolve these issues prior to trial. See *People v. Caballero*, 102 Ill. 2d 23, 31-32 (1984) ("Without a post-trial motion limiting the consideration to errors considered significant, the appeal is open-ended. Appellate counsel may comb the record for every semblance of error and raise issues on appeal whether or not trial counsel considered them of any importance."). But criminal defendants can and do forfeit issues and there is no reason here to relieve Hughes of the consequences of a finding of forfeiture.

-20-

¶ 96    A finding of forfeiture requires a reviewing court to engage in a plain error analysis. *People v. Taylor*, 2011 IL 110067, ¶ 30. Our supreme court has recognized that the plain error doctrine is a "narrow and limited exception to the general waiver rule." (Internal quotation marks omitted.) *People v. Herron*, 215 Ill. 2d 167, 177 (2005) (quoting *People v. Hampton*, 149 Ill. 2d 71, 100 (1992)). The predicate to a discussion of plain error is the determination that an error occurred in the trial court. *People v. Walker*, 232 Ill. 2d 113, 124-25 (2009) (initial step in plain error analysis is to determine whether error occurred at all); *People v. Smith*, 372 Ill. App. 3d 179, 181 (2007) (without error there can be no plain error). Because I conclude that Hughes' confession was properly admitted, there is no occasion to consider either prong of the plain error equation.

¶ 97    In finding that Hughes' confession to shooting Coleman was involuntary, the majority has taken the opportunity to review the entirety of the circumstances of Hughes' interrogation and confessions *de novo* and to make factual determinations, none of which Hughes requested the trial court to make and, in one significant respect, have not even been urged by Hughes on appeal. Thus, the majority has taken on the role of fact finder, a function incompatible with any recognized standard of review.

¶ 98    The majority's analysis focuses on its review of the videotape of Hughes' interrogation from 4:16 p.m. on October 26, 2006, to 6:10 a.m. on October 27, 2006. I do not take the position, as the majority suggests, that we should not review the videotape. Rather, while we have an obligation to review the entire record (as we do in every appeal), my quarrel is with the majority assuming the role of fact finder where no evidentiary hearing was held in the trial court. I, too, have carefully reviewed this same videotape and come to conclusions opposite those reached by the majority, a result which, in my view, underscores why appellate tribunals do not engage in fact-finding.

¶ 99    First, I take issue with the majority's decision to address an issue not raised by Hughes on appeal. The majority finds, as a fact, that during the period from 1:49 a.m. to 2:15 a.m., when Hughes was left alone in the interrogation room, he smoked marijuana he had hidden on his person and was, therefore, under the influence when he was taken for his polygraph examination. The majority further finds that the detectives knew Hughes had smoked marijuana, citing to the transcription of the interrogation and its interpretation of Detective Ford's comments and reaction upon reentering the interrogation room.

¶ 100    Hughes' appellate briefs do not raise any claim that he was under the influence of marijuana during his polygraph exam. No hearing was held on these issues in the trial court. In no case cited by the majority has the reviewing court acted as the finder of fact as to issues not raised by a defendant in the trial court. See *People v. Woods*, 184 Ill. 2d 130, 133-43 (1998) (reciting extensive evidence introduced at suppression hearing, including defendant's testimony regarding his treatment during interrogation); *People v. Traylor*, 331 Ill. App. 3d 464, 466-67 (2002) (same).

¶ 101    The majority's decision to, *sua sponte*, raise this issue runs contrary to the teachings of our supreme court in *People v. Givens*, 237 Ill. 2d 311 (2010). In *Givens*, the defendant, an overnight guest at an apartment, raised several issues on appeal, including whether her trial counsel was ineffective for withdrawing a motion to suppress evidence based on a claim that

-21-

the tenant's consent to the search was not voluntary. Rather than resolving the appeal on the issues raised, the appellate court framed the issue as whether trial counsel was ineffective for failing to pursue a motion to suppress based on the tenant's lack of authority to consent to a search of her guest's bedroom and remanded the case with directions to hold another suppression hearing and, if necessary, a new trial. *Id.* at 322-23.

¶ 102    On the State's appeal, the supreme court reversed, finding that this court erred in raising and addressing a theory never raised by defendant or addressed by the parties. Noting it well settled that " 'a reviewing court should not normally search the record for unargued and unbriefed reasons to *reverse* a trial court judgment' " (emphasis in original) (*id.* at 323 (quoting *Saldana v. Wirtz Cartage Co.*, 74 Ill. 2d 379, 386 (1978))), the court concluded that "the appellate court stepped over the line from neutral jurist to that of an advocate for defendant to raise and rule on issues that were neither controlled by clear precedent nor dictated by an interest in a just result." *Givens*, 237 Ill. 2d at 325.

¶ 103    " '[Courts] do not, or should not, sally forth each day looking for wrongs to right. We wait for cases to come to us, and when they do we normally decide only questions presented by the parties. Counsel almost always know a great deal more about their cases than we do ***.' " *Greenlaw v. United States*, 554 U.S. 237, 244 (2008) (quoting *United States v. Samuels*, 808 F.2d 1298, 1301 (8th Cir. 1987) (Arnold, C.J., concurring in denial of rehearing *en banc*)).

¶ 104    The *Givens* court acknowledged that while an appellate tribunal certainly has the authority to raise issues *sua sponte*, it should generally refrain from doing so except in the case of obvious errors controlled by binding precedent. As an example, the court cited a trial court's conviction of a defendant on four separate counts of murder in a case involving a single murder. *Givens*, 237 Ill. 2d at 328.

¶ 105    Here, even assuming Hughes smoked marijuana in the interrogation room (and I have serious reservations on that point, discussed below), there is no binding precedent that holds that if a criminal suspect has ingested a controlled substance prior to the time a polygraph exam is administered, any statements made to the polygraph examiner are *per se* coerced. The majority does not cite any such precedent. In fact, whether and to what extent ingestion of any substance, whether it be alcohol, prescription medicine, or an illegal drug, affected the voluntariness of a confession is an inherently fact-bound determination that must in the first instance be raised and presented to a trier of fact for resolution. See *People v. Kincaid*, 87 Ill. 2d 107, 119 (1981) ("[T]he fact that an accused is under the influence of drugs, self-administered or otherwise, when he makes a confession does not make the confession inadmissible automatically. It is still *the province of the trial court* to ascertain whether the accused's will was overborne at the time the confession was made." (Emphasis added.)); *United States v. Haddon*, 927 F.2d 942, 946 (7th Cir. 1991) (rejecting *per se* test: "*when the interrogating officers reasonably should have known that a suspect is under the influence of drugs* or alcohol, a lesser quantum of coercion may be sufficient to call into question the voluntariness of the confession" (emphasis added)). Thus, under *Givens*, I strongly believe that because Hughes has not raised this issue on appeal, neither should we.

¶ 106    Second, even if it is appropriate for appellate courts to *sua sponte* identify without

resolving issues that have not been raised by the parties in order that they may be addressed in a hearing on remand (see *People v. Rodriguez*, 336 Ill. App. 3d 1, 13-14 (2002)), the majority does not remand this matter for hearing on the new issues raised by Hughes on appeal, but instead orders a new trial based on its finding that Hughes' confession was coerced, thus bypassing any opportunity for a trier of fact to hear and evaluate evidence and make factual findings based on that evidence.

¶ 107    Further, Hughes' alleged ingestion of marijuana in the interrogation room is not, in my view, the type of issue that a reviewing court should raise *sua sponte*. The physical condition of a suspect being interrogated is an issue often raised by defense counsel in challenging the voluntariness of a confession. Indeed, it was one of the laundry list of grounds included, but not pursued, in defense counsel's motion to suppress in this case. The issue is neither esoteric nor novel. Able defense counsel do not need our help in deciding whether to pursue such an issue based on the circumstances of a suspect's interrogation, particularly where there is a videotape recording of the entire interrogation. The experienced trial judge reviewed the videotape and did not identify the issue the majority now addresses.

¶ 108    Third, my examination of the videotape of Hughes' interrogation reinforces my belief that the majority errs on this point. At 12:45 a.m., while Hughes was alone in the interrogation room, the videotape shows him pulling something out of his pants. The crackling of paper can be heard although Hughes' back is to the camera. He appears to be licking the paper and at 12:47 a.m., he puts whatever he took out back into his pants.

¶ 109    Hughes and the two detectives can be seen smoking cigarettes at various times throughout the interrogation. Cigarette butts were thrown on the floor of the room. At 1:48 a.m., the detectives gave Hughes a cigarette and turned out the lights in the room after telling him they would be back in the morning to take him for his polygraph.

¶ 110    The black and white videotape shows Hughes smoking the cigarette for several minutes, then, at 1:54 a.m., using it to light something he has taken out of his pants. At that point, Hughes has two lit items in his hands, which he alternately smokes. At 1:55 a.m., Hughes can be seen bending down and running his hand around the floor by the table where he and the detectives had been sitting, picking something up off the floor and using one of the items he had lit in his hand to light what he has picked up. At 1:57 a.m., Hughes puts something behind the bench in the room and continues to smoke. At 2:02 a.m., he again goes over to the area around the table, runs his hand over the floor, picks something up off the floor and again uses whatever he had lit in his hand to light what he has picked up. He continues to smoke for another minute and lies down on the bench at 2:03 a.m. At 2:04 he takes whatever he put behind the bench, puts it in his pants and lies down again.

¶ 111    The detectives reentered the interrogation room 11 minutes later at 2:15 a.m. The majority quotes from the transcript of the videotape and concludes that when Detective Ford entered the room, he must have smelled marijuana and asked Hughes, "What were you smoking? Buds [marijuana]?" (the word "marijuana" appears nowhere in the transcript) to which Hughes responded, according to the transcript, "Yeah, smoking buds." See *supra* ¶ 30. The majority then criticizes what it interprets as Ford's nonchalant reaction to the fact that Hughes had a controlled substance in the interrogation room, the implication being perhaps

that the detectives were watching Hughes from a remote location and decided to advance the polygraph exam knowing that he would be particularly vulnerable having just smoked marijuana. The majority evidently also believes, without so stating, that the detectives, knowing that Hughes just admitted having a controlled substance on his person and seeing on the videotape that he put something in his pants, would accept his representation that he had smoked his last "bud" and would, therefore, refrain from searching either him or the room to confirm that fact and remove any contraband. The videotape reveals no such search.

¶ 112    The majority's conclusions regarding what transpired in the interrogation room may have been warranted had an evidentiary hearing been conducted in the trial court during which: (1) the detectives testified as to what they smelled upon entering the room; (2) Ford confirmed that he said "buds"; (3) Ford testified that he meant marijuana when he referred to "buds"; (4) evidence was presented regarding how much marijuana Hughes actually smoked; and (5) evidence was presented regarding Hughes' physical condition immediately after smoking the marijuana, 1½ hours later when he started the polygraph exam, and 3½ hours later when he confessed to shooting Coleman. Yet none of these issues were raised by Hughes, much less resolved by a finder of fact.

¶ 113    The majority's suggestion that the uncertified transcript of the interrogation prepared by an unidentified employee of the Chicago police department is somehow "binding" on the prosecution is misplaced. Because of the quality of the audio-visual equipment used in videotaping interrogations, trial counsel often disagree about the correct transcription of statements made by the participants during interrogations. Indeed, the majority cites to an instance where Hughes claims he said something other than the words reflected in the transcript. Courts frequently resolve discrepancies regarding the accuracy of a transcript of a recorded statement prior to trial and, importantly, after an evidentiary hearing. See *United States v. Howard*, 80 F.3d 1194, 1199 (7th Cir. 1996) (objections to government's transcript of recorded statements involving defendant and informant appropriately resolved via a pretrial hearing); *United States v. Zambrana*, 841 F.2d 1320, 1336 (7th Cir. 1988) (same re translation of recorded conversations in Spanish to English: if parties cannot stipulate to contents of transcript, " 'then each side should produce its own version of the disputed portions. In addition, each side may put on evidence supporting the accuracy of its version or challenging the accuracy of the other side's version' " (quoting *United States v. Howard*, 603 F.2d 506, 509 (5th Cir. 1979))). Here, not only does the majority attribute nonsensical statements to Ford ("You're smoking in here now that we're all sitting in here smoking."), but it then interprets the word "buds" to conclude that Ford meant marijuana and *must have known* that Hughes had just smoked marijuana. This is the province of the trial court, not a court of review.

¶ 114    Having watched and listened to the videotape several times, it is just as likely in my view that the following is an accurate transcription of the exchange between Ford and Hughes:

"Q. It's smokier in here now than when we were all sitting in here smoking. Were you smoking butts?

A. Yeah, butts.

Q. How'd you get it lit?

A. Off the one I had I just kept smoking 'til I fell to sleep. That's the last one I had right there."

This, of course, would explain Ford's low-key reaction as well as the detectives' failure to search Hughes or the interrogation room.

¶ 115 The point is that reasonable people can look at the video of an interrogation and, without explication or explanation, come to different conclusions regarding what is shown. This only highlights why a reviewing court should not engage in this exercise.

¶ 116 Independent of the foregoing issue, I also disagree with the majority's analysis of the factors relevant to a determination of whether Hughes' confession was voluntary. As the majority notes, the relevant factors include: (1) the defendant's age, education, experience and physical condition at the time of the detention and interrogation; (2) the duration of the interrogation; (3) the presence of *Miranda* warnings; (4) the presence of any physical or mental abuse; and (5) the legality and duration of the detention. *People v. Harris*, 2012 IL App (1st) 100678, ¶ 63. A trial court's factual findings made after an evidentiary hearing on a motion seeking to suppress a confession are reviewed under the manifest weight of the evidence standard. The court's conclusion regarding the voluntariness of a confession is reviewed *de novo*. *People v. Murdock*, 2012 IL 112362, ¶ 29.

¶ 117 Here, wholly apart from addressing an issue not raised by Hughes, the majority engages in a detailed factual analysis of the contents of the videotape *as if* an evidentiary hearing addressing these issues had been conducted in the trial court, which, of course, it was not. Therefore, it is unclear under what standard the majority is reaching the conclusions it finds warrant reversal. See *People v. Deleon*, 227 Ill. 2d 322, 332 (2008) (finding is against the manifest weight of the evidence "only if the opposite conclusion is clearly evident or if the finding *** is not based on the evidence presented"). However, even if it was appropriate for us to search the videotape in an effort to identify and resolve issues regarding the facts and circumstances of Hughes' interrogation, I could not agree that such review supports the conclusion that the motion to suppress was wrongly denied or that the matter should be remanded for a hearing on the new issues raised by Hughes on appeal.

¶ 118 Hughes received *Miranda* warnings several times during his interrogation and his detention and its duration were legal. Thus, these factors weigh in favor of a finding that Hughes' confession to killing Coleman was voluntary.

¶ 119 The majority cites Hughes' age (19), education (ninth grade), and his lack of prior experience with the criminal justice system as factors that weigh in favor of a finding that his confession to Coleman's murder was involuntary. But despite the fact that Hughes was a teenager, he was clearly an adult for purposes of his criminal prosecution and a 19-year-old with a minimal education is capable of voluntarily confessing. See *People v. Eckles*, 128 Ill. App. 3d 276 (1984) (19-year-old with tenth-grade education).

¶ 120 *Eckles*, cited by the majority, is actually quite analogous to this case. The court in *Eckles* noted that the 19-year-old defendant confessed after an interrogation that lasted 25 to 35 minutes. Here, the videotape reveals that after the detectives began questioning Hughes at 4:16 p.m., 16 minutes later, at 4:32 p.m., he admitted that he acted as the lookout when Coleman was murdered, and three minutes after that, at 4:35 p.m., he admitted that he knew

-25-

in advance about the plan to murder Stanley and was present in the alley at the time it took place. Thus, Hughes implicated himself in both murders in under 20 minutes.

¶ 121    One of the reasons *Eckles* was a "close case" was that the defendant testified at the suppression hearing that he confessed to committing the crime so that the officer "might help make things go easier for him" and the officer denied making any promises of leniency. *Eckles*, 128 Ill. App. 3d at 280 (Alloy, P.J., dissenting). Here, Hughes elected not to testify at the suppression hearing and, therefore, there is no basis in the record from which we can discern his reasons for admitting to shooting Coleman. Figueroa-Mitchell certainly did not promise that Hughes would be treated more leniently if he confessed. We do know, however, that the crimes Hughes confessed to did occur and that his voluntary statements rendered him legally responsible for both murders regardless of whether he actually shot Coleman, thus eliminating any concern over a "false" confession by an innocent individual.

¶ 122    Further, Hughes' juvenile record, while not extensive, did involve a finding on an unlawful use of a weapon charge, a serious offense. We do not know, again because Hughes failed to raise the issue in the trial court, whether Hughes went to trial or pled guilty on these juvenile matters, but the majority finds, without any evidentiary basis, that Hughes had no meaningful prior experience in understanding and waiving his rights.

¶ 123    In my view, the majority's finding regarding Hughes' experience is undercut by the videotape of Hughes reading, at Ford's direction, the consent to take a sample of his DNA. Despite his ninth-grade education, on the videotape Hughes pronounces without hesitation the following words and phrases: "constitutional," "judicial order," "biological evidence," "appropriate laboratories," and "legitimate law enforcement purposes." He stumbles only over the words, "analysis" and "prosecutorial." In *State v. Skillicorn*, 944 S.W.2d 877 (Mo. 1977), cited by the majority, the court found that defendant's *inability* to pronounce the word "coercion" did not indicate that his lack of understanding of his rights rendering confession involuntary. But obviously Hughes' ability to pronounce without hesitation complex words and phrases undercuts any conclusion that his ninth-grade education left him unable to understand and waive his rights.

¶ 124    Moreover, despite Hughes' lack of experience with the criminal justice system, he readily understood the concept of accountability, complaining several times throughout the interrogation that Skyles' girlfriend was "just as accountable as me" because she knew everything in advance about the robbery of Coleman and the murder of Stanley. If, as the majority concludes, Hughes' first encounter with the legal doctrine of accountability was during his interrogation when Ford explained it to him, he was certainly a quick study.

¶ 125    Hughes' "regular substance abuse," *i.e.*, his self-reported daily use of marijuana, was first made known to the trial court in his pre-sentence investigation report. Thus, it is inappropriate for us to consider this in connection with a challenge to a ruling on a motion to suppress. See *Murdock*, 2012 IL 112362, ¶¶ 36-37; *People v. Brooks*, 187 Ill. 2d 91, 108-09 (1999) (evidence adduced at trial should not be considered on appeal for purposes of reversing a ruling on a motion to suppress; proper procedure would have been for trial counsel to request reconsideration on motion to suppress). Furthermore, on the videotape, Hughes is alert, loquacious and cooperative, at least until he realizes that he can no longer

minimize his involvement in Coleman's murder. He does not complain to the detectives that he does not understand their questions or inform them that he is in any way impaired. Thus, I cannot agree that Hughes' age, education and experience weigh in favor of finding that his confession to Coleman's murder was involuntary.

¶ 126    The length of Hughes' interrogation also does not support a finding of involuntariness. Despite the fact that Hughes was held (properly) and interrogated from 4:16 in the afternoon until shortly after 6:10 a.m. the next day, the length of time he was actually questioned amounts to under three hours. The longest period of examination lasted less than one hour. The videotape shows that Hughes was left alone for long stretches of time, was allowed to go to the bathroom, was provided food and drink, and during one extended interval during the evening, slept for roughly 3½ hours. See *People v. Rosemond*, 339 Ill. App. 3d 51, 62 (2003) (where defendant's questioning interspersed with breaks and not continuous, and where he was given food and drink, "there is little basis to conclude that the confession resulted from the duration of the interrogation").

¶ 127    The majority's finding that Hughes' obvious state of "exhaustion" prompted him to confess in response to Detective Figueroa-Mitchell's exhortations to tell the truth[2] is belied by the portions of the videotape after Hughes returns to the interrogation room and reiterates to Ford his confession to killing Coleman. After the detectives leave the interrogation room at approximately 6:10 a.m., the videotape shows Hughes awake for a majority of the time. He sleeps for only about one hour between the time he returns to the room and 10:24 a.m., when he is taken from the room. This factor likewise does not weigh in favor of a finding that Hughes' confession to killing Coleman was involuntary.

¶ 128    The majority cites the "coercive atmosphere" created by the fact that Hughes' hands were handcuffed behind his back during the approximately 1½-hour ride from Kalamazoo to Chicago. The record reveals that the detectives traveled to Michigan in a rental car, a vehicle that presumably was not equipped with the normal safety features of a police squad car. Under such circumstances, it would have been foolhardy for the detectives to transport a double-murder suspect in any other way. Furthermore, the handcuffs were removed upon Hughes' arrival at the interrogation room. The majority does not explain how the "coercive atmosphere" created during a car ride in the afternoon had any effect on Hughes' confession to shooting Coleman made nearly 16 hours later.

¶ 129    The fact that Hughes confessed to shooting Coleman at approximately 5 a.m., after being awake most of the night, while relevant, does not, under the circumstances of this case, compel a finding of involuntariness. The only case cited by the majority, *People v. Travis*, 2013 IL App (3d) 110170, is a case involving a 15-year-old juvenile. In *Travis*, prior to the late-night interview in which defendant confessed to the murder, he told the detectives, " 'I

---

[2]Again, as long as we are analyzing the videotape, I would attribute the change in Hughes' demeanor during Figueroa-Mitchell's questioning and particularly after she informed him he failed the polygraph, as reflecting the sobering realization that he could no longer avoid admitting that he shot Coleman. But again, we have no evidence in the record, and certainly no testimony from Hughes, from which we can infer the reason he decided to confess.

don't even want to talk to you no more.' " *Id.* ¶ 16. Notwithstanding defendant's expression of unwillingness to continue to talk to them and after defendant had fallen asleep, the detectives reentered the room, woke defendant and immediately began to interrogate him. Prior to defendant's confession, one of the detectives made misleading promises of leniency to the defendant by suggesting that " 'everybody gets a clean slate at 17' " when he knew defendant would be charged as an adult. *Id.* ¶¶ 18-19. This court concluded that under the totality of the circumstances, defendant's confession was not voluntary.

¶ 130    *Travis* provides no support for the result reached by the majority. Aside from the fact that *Travis* involved a confession by a juvenile, which implicates "sensitive concerns" not present here, *People v. Prude*, 66 Ill. 2d 470, 476 (1977), throughout the period of time Hughes was interrogated, he never expressed any reluctance to speak to the detectives. He never told the detectives that he was too tired to continue or to take the polygraph exam. As noted, quite early on, Hughes implicated himself in both murders. The progress of his interrogation thereafter reveals that he endeavored to minimize his involvement revealing, first, that he acted as a lookout when Coleman was murdered and that he knew of the plans and was present for Stanley's murder. Second, Hughes admitted that he disposed of the .357 magnum used in Stanley's murder. Third, Hughes admitted killing Stanley. Finally, Hughes admitted shooting Coleman in the legs with the .357 magnum. No promises of leniency prompted Hughes to make these admissions. In fact, Detective Ford told him that based on the admissions made less than 20 minutes after the interrogation began, he could be charged with both murders. *Travis* provides no support for a finding that Hughes' confession to shooting Coleman was involuntary.

¶ 131    The majority notes that Hughes was grieving for his grandfather during the interrogation, but concludes that this does not weigh in favor of a finding that his confession was involuntary. I agree. Although Hughes had just learned of his grandfather's death, he had passed away months before Hughes was arrested, and, therefore, Hughes must not have talked to him in at least that period of time. The recollection of his grandfather prompted Hughes to admit only to the fact that he disposed of the .357 magnum. Further, within minutes of Hughes asking Ford whether his grandfather died peacefully, Hughes can be seen on the videotape laughing with the detectives about the fact that Skyles' girlfriend (who after Stanley's murder went to the police station to report her car, found at the scene with license plates on it registered to Hughes, stolen) was kept at the police station and questioned for 72 hours, saying that "she crack like an egg." Finally, although the videotape shows Hughes pacing the interrogation room after he admitted disposing of the gun and talking out loud to his grandfather, the same segment shows him commenting, more than once, about the fact that his best friend, Cordell, nicknamed Boo, had talked to the police about everything Hughes had told him, saying "Boo stool pigeon. I knew Boo was gonna tell."

¶ 132    Finally, my colleagues fault Hughes' interrogators and, in particular, Detectives Ford and Figueroa-Mitchell, for "lies" they told Hughes, which the majority concludes render Hughes' confession involuntary. Deceit perpetrated by police interrogators is certainly a relevant consideration in determining whether a suspect's confession was voluntary, but like any other factor, it is not determinative. *People v. Melock*, 149 Ill. 2d 423, 450 (1992) ("While deception weighs against a finding of voluntariness and is relevant, it is but one factor to be

-28-

considered within the totality of the circumstances in determining voluntariness. [Citations.] The fact that a confession was procured by deception or subterfuge does not invalidate the confession as a matter of law."). Other courts considering claims that misstatements by police coerced the accused's confession have concluded that "[o]f the numerous varieties of police trickery *** a lie that relates to a suspect's connection to the crime is the least likely to render a confession involuntary." *Holland v. McGinnis*, 963 F.2d 1044, 1051 (7th Cir. 1992). Addressing a claim that the suspect's confession was coerced because police misinformed him that witnesses had seen his car in the alley where the victim was raped, the Seventh Circuit commented:

> "Such misrepresentations, of course, may cause a suspect to confess, but causation alone does not constitute coercion; if it did, all confessions following interrogations would be involuntary because 'it can almost always be said that the interrogation caused the confession.' *Miller v. Fenton*, 796 F.2d 598, 605 (3d Cir.), *cert. denied*, 479 U.S. 989 *** (1986). Thus, the issue is not causation, but the degree of improper coercion, and in this instance the degree was slight. Inflating evidence of Holland's guilt interfered little, if at all, with his 'free and deliberate choice' of whether to confess [citation], for *it did not lead him to consider anything beyond his own beliefs regarding his actual guilt or innocence, his moral sense of right and wrong, and his judgment regarding the likelihood that the police had garnered enough valid evidence linking him to the crime.* In other words, the deception did not interject the type of extrinsic considerations that would overcome Holland's will by distorting an otherwise rational choice of whether to confess or remain silent." (Emphasis added.) *Id.*

See also *State v. Lapointe*, 678 A.2d 942, 961 (Conn. 1996) (detective informed suspect that suspect's prints had been found on handle of knife used to stab the victim, even though no prints had actually been found; confession determined voluntary).

¶ 133    Although the majority refers to "lies" by Detectives Ford and Figueroa-Mitchell, the opinion focuses only on the latter. While there is mention of Ford's statement to Hughes that Coleman died of his leg wounds and not the head wound, the majority does not draw a connection between this statement, made at 12:27 a.m., and Hughes' confession to shooting Coleman, made 4½ hours later. And, in fact, there is simply no apparent causal or temporal connection that can be inferred from this isolated statement.

¶ 134    The majority places primary emphasis on the statements made by Detective Figueroa-Mitchell in the course of her polygraph exam. I can find nothing on the videotape or in the transcript of her interaction with Hughes that would support a finding that Hughes was coerced by Figueroa-Mitchell into admitting he shot Coleman. Figueroa-Mitchell repeatedly encourages Hughes to tell the truth. There is no case that even remotely suggests that such exhortations are coercive. See *People v. Valle*, 405 Ill. App. 3d 46, 51 (2010) (detective told murder suspect to " 'get it off his chest' " and that the best thing he could say is " 'I screwed up' "). Figueroa-Mitchell was entitled to appeal to Hughes' "moral sense of right and wrong." *Holland*, 963 F.2d at 1051.

¶ 135    Although Figueroa-Mitchell makes reference to going to court, she never states or implies that she would be helpful to Hughes or that confessing to shooting Coleman would

result in more lenient treatment. After administering the polygraph, Figueroa-Mitchell informs Hughes: "This one question LB [Hughes' nickname] I asked you–I said did you have a gun in that house the whole test you just dropped to the floor. I don't know why. I wasn't there but according to this it ain't truth. You did have one. And I don't know why you would tell me no." After telling Hughes "I'm fighting for you over here," Figueroa-Mitchell informs him, "I'm trying to get you to say I'm sorry. *** 'Cause believe me they [the police] already got facts." A few seconds later, Figueroa-Mitchell asks, "I'm just asking you was this a mistake?," to which Hughes replies, "Yes." A short time later, Hughes, who was by then crying, admitted that he shot Coleman in the legs. The transcript reflects that Figueroa-Mitchell successfully appealed to Hughes' sense of guilt and remorse and that she did not coerce his confession to shooting Coleman by interjecting "extrinsic considerations" designed to override his free will.

¶ 136    There is also no suggestion in the record that Figueroa-Mitchell lied about the results of Hughes' polygraph. Thus, the majority's citation of *Melock* on this point is misplaced. In *Melock*, the evidence presented during the suppression hearing showed that the polygraph administered to defendant yielded no result. *Melock*, 149 Ill. 2d at 449-50 (detective's accusation regarding defendant's culpability, "coupled with his false statement concerning the nonexistent results, clearly suggested to defendant that he had lied"). Thus, when the detective informed defendant that he had "failed" the polygraph, that statement was demonstrably false. Here, nothing in the record suggests that Figueroa-Mitchell's statement regarding the results of the polygraph was incorrect.

¶ 137    Despite what he must have realized was extraordinarily damning evidence against him, Hughes persisted in his denial that he shot Coleman throughout his interrogation. It was only after Figueroa-Mitchell accurately informed him that he had failed the polygraph that Hughes decided to confess.

¶ 138    The scenario involving a suspect who confesses after being confronted with the results of a polygraph examination is not unusual and the use of this investigative technique is not, as the majority suggests, improper or inherently coercive. More than 30 years ago, the United States Supreme Court recognized the use of polygraph examinations in criminal investigations and found that a suspect's incriminating statements were not coerced when they were made to the polygraph examiner after being confronted with the results of the exam showing that he had not been truthful. *Wyrick v. Fields*, 459 U.S. 42, 48-49 (1982). Specifically, the Court found it "unreasonable" to assume that defendant "would not be informed of the polygraph readings and asked to explain any unfavorable result." *Id.* at 47. The Court also recognized that although the results of the polygraph examination were not admissible, the defendant's responses to questions by the examiner, like those made to any other law enforcement officer, were admissible. *Id.* at 48. See also *Keiper v. Cupp*, 509 F.2d 238, 240 (9th Cir. 1975) (finding statements made by emotional, weeping suspect after being informed that the results of the polygraph showed "gross deceptive patterns" were not coerced).

¶ 139    Detective Figueroa-Mitchell did not, as the majority finds, "cloak herself with the imprimatur of certainty." She informed Hughes of the results of the polygraph, which indicated that with respect to the question of whether he had a gun when he was in

-30-

Coleman's house, Hughes' involuntary responses suggested he had lied. There is nothing improper and, more importantly, coercive about this accurate information. Figueroa-Mitchell simply informed Hughes, as Ford had numerous times during the interrogation, that she did not believe he was telling the truth about shooting Coleman.

¶ 140    The evidence in this case was not, as the majority finds, "closely balanced." Thus, even if the admission of Hughes' confession was error, it was clearly harmless error. See *People v. Wrice*, 2012 IL 111860, ¶ 71 (recognizing that under *Arizona v. Fulminante*, 499 U.S. 279 (1991), confessions, other than those induced by physical coercion, are subject to harmless error analysis). Hughes, not his codefendant Skyles, fled the Chicago area after the murders. By the time Hughes was apprehended in Michigan, some 11 months after the crimes, the police had arrested Skyles, charged him with both murders and obtained statements from him implicating Hughes. They had talked to Skyles' girlfriend who, according to Hughes, knew "everything" about both murders, and they had talked to Hughes' best friend Boo and brought him before a grand jury where Boo detailed all of Hughes' admissions to his involvement in the murders, including shooting Coleman. Temporary license plates registered to Hughes were on the car found in the alley where Stanley was shot. Inside the car was a hat with Hughes' DNA on it. The police knew that Stanley was murdered because Skyles, Skyles' girlfriend and Hughes were afraid Stanley would talk to the police. The police told Hughes about all the foregoing evidence they had and those representations were absolutely true.

¶ 141    Moreover, Hughes readily implicated himself in both murders (and thus rendered himself fully accountable for those crimes) under circumstances the majority concedes render those statements voluntary. Hughes admitted that the "plan" to rob Coleman from its inception included shooting the person who answered the door at Coleman's residence, albeit on the assumption that it would be an armed drug dealer. Thus, even without Hughes' final admission that he shot Coleman in the legs, a jury could readily have found him guilty of Coleman's murder. The evidence against Hughes was overwhelming. Given the substantial evidence of Hughes' guilt, the admission of his confession to shooting Coleman, if error at all, was clearly harmless.

¶ 142    Nothing about Hughes or the totality of the circumstances of his interrogation lead me to conclude that his confession to shooting Coleman was involuntary. I would find that Hughes has forfeited review of the issues he raises on appeal and because the admission of his confession was proper, I would affirm his conviction.

¶ 143    For the foregoing reasons, I respectfully dissent.