# Illinois Official Reports

## Supreme Court

<div style="border">

### *People v. Hughes*, 2015 IL 117242

</div>

| | |
|---|---|
| Caption in Supreme Court: | THE PEOPLE OF THE STATE OF ILLINOIS, Appellant, v. CAVINAUGH HUGHES, Appellee. |
| Docket No. | 117242 |
| Filed | December 17, 2015 |
| Decision Under Review | Appeal from the Appellate Court for the First District; heard in that court on appeal from the Circuit Court of Cook County, the Hon. John P. Kirby, Judge, presiding. |
| Judgment | Appellate court judgment affirmed in part and reversed in part. Circuit court judgment affirmed. Cause remanded. |
| Counsel on Appeal | Lisa Madigan, Attorney General, of Springfield, and Anita Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Michelle Katz and Janet C. Mahoney, Assistant State's Attorneys, of counsel), for the People.<br><br>Michael J. Pelletier, State Appellate Defender, Alan D. Goldberg, Deputy Defender, and Deborah K. Pugh, Assistant Appellate Defender, of the Office of the State Appellate Defender, of Chicago, for appellee. |

Justices                       CHIEF JUSTICE GARMAN delivered the judgment of the court, with opinion.

Justices Freeman, Karmeier, and Theis concurred in the judgment and opinion.

Justice Burke specially concurred, with opinion, joined by Justices Thomas and Kilbride.

**OPINION**

¶ 1      Defendant Cavinaugh Hughes was convicted in a bench trial of first-degree murder in the 2005 shooting deaths of Elijah Coleman and Joshua Stanley. Coleman was a 68-year-old man shot multiple times at his Chicago home in a botched robbery on November 18, 2005; Stanley was defendant's alleged coconspirator, gunned down in an alley the next day. Defendant's own statements in taped police interrogation were admitted as evidence against him at trial.

¶ 2      Relevant to this appeal, defendant sought suppression of those statements. He argued they were involuntary due to police questioning him off-camera and without *Miranda* rights and due to physical coercion from handcuffs kept on him an excessively long time. The circuit court of Cook County denied that motion. Defendant brought it up again in his posttrial motion, which was also denied.

¶ 3      The appellate court concluded the confession should have been suppressed due to doubts it was voluntary. The appellate court reached this conclusion based on defendant's age, educational level, sleep and food deprivation, prior substance abuse, deceptive conduct by police, length of interrogation, a coercive atmosphere, lack of experience with the criminal justice system, and use of marijuana while in police custody. The appellate court reversed and remanded for a new trial. 2013 IL App (1st) 110237. It also corrected defendant's mittimus in the event he should be convicted again. *Id.* This court granted the State's petition for leave to appeal. Ill. S. Ct. R. 315 (eff. July 1, 2013).

¶ 4                                 BACKGROUND

¶ 5      Elijah Coleman was shot multiple times, as he opened his front door, in a home invasion robbery attempt. He suffered gunshot wounds to his left thigh and knee and a gunshot wound in his right ear, and he died in the entryway to his home. The trial court heard evidence that Coleman was targeted due to a rumor he had won the lottery. Coleman's grandnephew attended school with Joshua Stanley, who embarked on a plan to rob Coleman. Stanley, 16, was gunned down in an alley the night after Coleman's killing. He suffered gunshot wounds to his left abdomen, left shoulder, left arm, right thigh, and right lower leg and was pronounced dead at a hospital. Parked nearby was a 2001 Impala belonging to Jetun Coburn, who was at that time the girlfriend of Dorian Skyles, then aged 32. That Impala had altered temporary plates on it, with the registration address (but not the owner name) of those plates being defendant's.

¶ 6       Coburn had reported the Impala as stolen, but Chicago police detectives questioned her, and her responses led police to question Skyles. Police also questioned Cordell Matthews, aged 17, and the statements of Skyles and Matthews led police to seek the arrest of defendant.

¶ 7       Defendant, meanwhile, had left the state for Michigan and would not be brought into custody for another 11 months. On October 26, 2006, two detectives traveled to Kalamazoo County, Michigan, in a rental car to bring defendant back to Chicago for interrogation. Because they were traveling in a rental car, they kept defendant handcuffed behind his back for the ride back from Michigan. One of the detectives estimated that ride to take about an hour.

¶ 8       Detectives placed defendant in an interrogation room with an electronic recording device already activated. He implored them to remove the handcuffs and expressed relief when detectives removed them. Detectives Patrick Ford and Robert Brannigan began interrogating defendant around 3:30 p.m. Questioning continued on and off over the course of several hours, with defendant repeatedly denying having pulled the trigger in either death.[1] Around 12:21 a.m., defendant admitted to throwing the weapon used to kill Stanley in the river, but he still maintained Skyles had been the one to kill both Stanley and Coleman. Around 1 a.m., defendant admitted to having shot Stanley, after detectives recounted that defendant had changed the plates on the Impala, ended up with the gun, and told Matthews he had shot Stanley. Detectives additionally told defendant that people looking out their windows had seen a suspect that resembled defendant and not Skyles, a claim that was not supported by any evidence brought out at trial.

¶ 9       Defendant agreed to sit for a polygraph examination to be taken in the morning. Detectives instead returned for him around 2:30 a.m. From about 3:30 to 4 a.m., defendant answered polygraph detective Tina Figueroa-Mitchell's questions, repeatedly denying that he had a gun in Coleman's house. Around 4:30 a.m., Figueroa-Mitchell returned to tell defendant he had repeatedly lied about having a gun in Coleman's house. She emphasized it was important for defendant to show remorse. Shortly before 5 a.m., defendant stated he and his coconspirators had expected a younger man to come to the door with a gun, and the plan had been for defendant to shoot that man twice in the legs. Defendant stated Stanley was in front of him and that defendant fired twice at Coleman's legs without seeing that he was an older man. Figueroa-Mitchell then brought in the other two detectives, and defendant told them that he shot Coleman in the legs.

¶ 10      Defendant later filed a motion to suppress all statements he made to police subsequent to his arrest. The motion asserted that prior to interrogation, defendant was not advised of his right to remain silent, "informed that anything he might say or do could be used against him in court," informed of his right to counsel, informed he had a right to have a lawyer present during the interrogation, or informed that he would be provided with representation in the event he was indigent. It also stated that "due to the physical, physiological, mental, educational, psychological state, capacity and condition of the defendant, he was incapable and unable to appreciate and understand the full meaning of his *Miranda* rights and any statements w[e]re therefore not the free and rational choice of the accused and was not made voluntarily, knowingly and intelligently in violation of the 5th and 4th Amendments to the Constitution of

---

[1]The appellate court decision contains an extensive description of the interrogation. See 2013 IL App (1st) 110237, ¶¶ 16-34.

the United States." The motion stated "the statements sought to be suppressed were obtained as a result of interrogation which continued after the defendant had elected to remain silent and/or had elected to consult with an attorney prior to further questioning in violation of the 5th and 14th Amendments to the Constitution of the United States." The motion further stated "the statements sought to be suppressed were obtained as a result of psychological and mental coercion illegally directed against the defendant and that such statements were, therefore, involuntary in light of the 5th and 14th Amendments to the United States Constitution." It then made an identical assertion, but with regard to physical coercion. The motion then repeated, word for word, the statement about psychological and mental coercion. It then stated "the statement[s] sought to be suppressed were obtained as the product of and as the result of confronting the accused with certain evidence which had been obtained in violation of the defendant's 4th amendment[ ] protection against illegal search and seizure," and "as the produc[t] of and as the direct and proximate result o[f] confronting the accused with the certain material misrepresentations in violation of the 5th and 14th Amendments to the United States Constitution." Finally, the motion stated that all "communications, confessions, statements, admissions, or tests executed by the defendant were elicited in violation of his constitutional rights under the Fourth, Fifth, Sixth, and Fourteenth Amendments to the United States Constitution of the State of Illinois" and requested a pretrial suppression hearing "to determine if the nature of such statements were voluntary."

¶ 11 At the hearing on the motion to suppress on July 20, 2009, defendant's trial counsel first presented two lines of argument: that the detectives cuffed defendant too uncomfortably for the ride down from Michigan, and that detectives questioned him on the drive down, without having informed him of his *Miranda* rights and without video recording. Defendant's trial counsel acknowledged the breadth of the motion to suppress, stating "those are the grounds on which we will be proceeding because we have filed a general motion. I just want to give notice to counsel those are the grounds we will be proceeding on." Apparently in response to discussion that took place off the record, counsel asked one of the assistant State's Attorneys, "Is that what you are asking, Miss Gonzalez?" Gonzalez responded in the affirmative.

¶ 12 The State then called Detective Patrick Ford, who recounted how he took custody of defendant. Ford stated he read defendant his *Miranda* rights from his Fraternal Order of Police book upon taking him into custody. Ford testified that defendant indicated he understood his rights and that he wanted to make a statement, but Ford told him it would have to wait until they arrived back at the Area Two station. Ford indicated he had no conversations with defendant about the murders, aside from the ones video recorded at Area Two. On cross-examination, Ford testified that he read defendant his *Miranda* rights at both the jail in Michigan and at Area Two on video, to avoid any mistakes about whether he had read them to defendant. Ford also acknowledged that he had refused defendant's requests to be cuffed in a different way, as being cuffed behind his back was uncomfortable for defendant, a large man. Defendant's trial counsel also posed brief questions about the detectives' persistence in asking questions of defendant after he gave exculpatory answers.

¶ 13 The State then called Detective Figueroa-Mitchell. On direct examination, she testified that defendant had been read his *Miranda* rights before the polygraph examination, had consented to the test with a written form, and had no off-camera conversations with her. Asked by the State if she had any difficulty in communicating with defendant, she replied that he "answered in an appropriate and timely manner" and that he had never complained about the way he was

treated by other police personnel. On cross-examination, defense counsel asked questions about whether the detectives would have been able to observe Figueroa-Mitchell's questioning of defendant, and whether this would have been obvious to defendant. Defense counsel then asked about the purpose of the test and what Figueroa-Mitchell told the detectives afterward. Figueroa-Mitchell responded that she aimed to find out the truth, and that she had told the detectives defendant did not pass.

¶ 14    The DVDs of defendant's interrogation were entered into evidence, and the parties stipulated to the content of the transcripts of defendant's interrogation. The State called no further witnesses, and defendant rested. In closing arguments on the motion, defense counsel argued that Detective Ford lacked credibility in explaining that he had read defendant his *Miranda* rights in Michigan and that detectives admitted handcuffing defendant in a way that caused him discomfort and pain. Defense counsel concluded by arguing the lack of reliable evidence that defendant received his *Miranda* warnings or that all statements were on video. "For that reason, the reasons that we have given, we would ask that you grant our motion to suppress statement." On rebuttal, defense counsel made reference to the length of the interrogation to bolster the argument that the court should infer that detectives interrogated defendant on the drive from Michigan: "As you can see it is numerous DVDs where the questioning continues and continues until they get the statement they want. I think it is not credible to believe they would wait an hour and a half when they have him, and apparently for whatever reasons he is talking."

¶ 15    Ten days later, the court ruled that defendant's confessions would not be suppressed. The court summarized the testimony heard and noted the allegations of physical and mental coercion. "The only grounds—possible grounds would be the handcuffing behind the back." The court acknowledged that defendant had said they were tight, but concluded they had no coercive effect on defendant. The court concluded: "But in reading the transcript and looking at the video, on the first page of the transcript and the video, when they brought him into the station into the interview room, what the defendant said is—in this Court's opinion is extremely important. He said—he asked to take the cuffs off, please, the cuffs. All right. Turn around. The defendant said, I can't see. I can't wait to get them off. Hold still. Can I get some water? You're just glad to get them off. And his answer was—and this is the defendant upon getting his handcuffs off—it's all good." The court noted that the detectives had made the trip in about an hour and a half and concluded there was no evidence of physical coercion. Further, the court noted both detectives had testified credibly that they had read defendant the *Miranda* warning. The motion to suppress was denied, and defendant did not renew any challenge to the admission of his confessions until his posttrial motion.

¶ 16    At trial, Dorian Skyles testified pursuant to a plea agreement. Skyles had previously faced a first-degree murder charge. In exchange for his testimony, he pled guilty to home invasion and conspiracy to commit murder, receiving 17-year and 7-year sentences, to run concurrently. Skyles testified that he gave defendant a gun to carry out the robbery but that he was not involved in carrying it out. Instead, he and Jetun Coburn parked down the street, without the robbery's direct participants being aware. Skyles testified that he heard shots fired, and defendant and the others fled from the house shortly after. Skyles also testified that he and defendant had discussed that Stanley would need to be killed, as they believed police would be able to track the robbery plot back to Stanley. Skyles denied that Jetun Coburn was involved in that conversation. He testified that he had dropped Stanley off for defendant to pick up in

Coburn's Impala and that defendant later called him saying he had lost the keys to the Impala. He acknowledged that he had initially lied to police and that he was a three-time felon who was selling drugs for his occupation at that time.

¶ 17   Cordell Matthews testified he had been invited by defendant to participate in the robbery with defendant, Skyles, and Stanley, but Matthews declined. He further testified that defendant called him the next day and said Stanley had shot Coleman and that Stanley and defendant had been armed. Matthews denied remembering whether defendant had told him that he had fired a gun and was impeached with his grand jury testimony from November 23, 2005. Matthews then admitted he had told the grand jury that defendant said Stanley had called out that Coleman had a gun when Coleman opened the door and that defendant then shot Coleman twice in the leg. Matthews also testified he went to Skyles's and Coburn's home in East Chicago, Indiana, with defendant, Stanley, and others. He denied remembering defendant and Skyles leaving the main room there but was impeached with his grand jury testimony in which he stated he heard them in the back room, discussing a plan to kill Stanley. Matthews' grand jury testimony also indicated Skyles had given defendant a gun for that purpose. Matthews testified he rode back to defendant's house with defendant in Coburn's Impala. He testified he did not remember defendant doing anything with the license plates but was impeached with his grand jury testimony in which he stated defendant put his temporary plates on the Impala and drove away.

¶ 18   Matthews testified he could not remember if, later that night, defendant had been driving Matthews around in defendant's own car and stopped on a bridge. He was then impeached with his own grand jury testimony, in which he stated defendant had stopped the car on the bridge from Indiana, gotten out of the car, and thrown a gun wrapped in a black shirt into the river. Asked why he was giving different answers now from his grand jury testimony, Matthews asserted he was "drunk and intoxicated" when he made those statements. He had been in police custody for approximately two days at that point; the State later brought forward an assistant State's Attorney who testified that Matthews did not exhibit any signs of intoxication and had given a coherent and detailed statement on a complex case. On cross-examination, Matthews also acknowledged he was scared to be in police custody and had given many inconsistent versions of events.

¶ 19   Some of defendant's statements were brought into evidence through the testimony of Detective Ford, who laid the foundation for them. Defendant sought to have all of the DVDs introduced if any portion of them were to be introduced. The court admitted the conversations offered by the State, noting that defendant could bring in background through testimony as needed. Defense counsel cross-examined Ford about the discomfort caused by bringing defendant down from Michigan in handcuffs, given that he was a teenager weighing about 300 pounds. Defense counsel cross-examined Ford about whether defendant had been able to get any sleep amid extensive questioning. Defense counsel cross-examined Ford about whether detectives had deceived defendant by saying they had DNA evidence linking him to the crimes and that there were witnesses. Ford acknowledged they had. Defense counsel also cross-examined Ford on whether defendant might have been so deferential to the police questioning him that he might not have been telling the truth when he admitted guilt. Defendant did not object at that time to the admission of the DVDs on the basis that his confessions were involuntary.

¶ 20        Aside from defendant's own statements, the major points of evidence implicating him in Stanley's death were the testimony of Skyles, the grand jury testimony of Matthews, the presence of defendant's DNA on a hat in the Impala, and the Impala's temporary plates registered to his residence, which Matthews had testified to seeing defendant place on the car. The weapon used to kill Stanley was never found, but unrebutted evidence at trial indicated the same gun was used to shoot both Stanley and Coleman. The State emphasized these points in its closing arguments, along with defendant's flight to Michigan the day after Stanley's murder. The State's closing argument did not discuss the voluntariness of defendant's statement.

¶ 21        Defendant's closing argument considered Skyles to be the mastermind of the Coleman robbery and Stanley murder, describing how the witnesses in the case should be viewed as untruthful. Moving on to defendant's confession, defense counsel brought up that defendant was only a teenager when he made those statements, that he had been in discomfort from the handcuffs, and that the court should look very carefully at the defendant's "age, his intelligence, his background, his experience, his mental capacity, his education, his physical condition," along with the duration of questioning. Defense counsel also argued detectives deceived defendant, that defendant was emotionally fragile from learning his grandfather had died recently, and that defendant was afraid of Dorian Skyles. These concerns should prompt the court to consider his confessions unreliable, defense counsel argued. "Under those conditions, Judge, I would suggest to you that his confession is not proof beyond a reasonable doubt. *** Judge, there are other cases that courts recognized where people confess not because of coercion or by the police, but *they confess voluntarily to facts that simply aren't true*, facts that simply couldn't be true when you learn more physical evidence." (Emphasis added.) Defense counsel repeatedly questioned the reliability of these statements and repeatedly suggested they were voluntary.

> "And we understand that even if they are voluntary, even if there's been a pre-trial hearing and there's been a ruling, there's been no constitutional violations, they still can be unreliable. And we don't leave it up to the trier of fact to decide if a confession alone is enough. We have a rule that says it is not because we recognize that. The Court in *Smith*[2] said—the United States Supreme Court said though a statement may not be quote, involuntarily, unquote within the meaning of the exclusionary rule, its reliability may be suspect if it is extracted from one who is under the pressure of a police investigation, whose words may reflect the strain and confusion attending this predicament rather than a clear reflection of his past. *** Judge, I would submit to you that that is what we have here, *a false confession voluntarily made* because of the age of Mr. Hughes, because of his condition, because of the duration of the questioning, because of his fear of Dorian Skyles and because of his emotional state because of the loss of his grandfather, who he clearly loves from that portion of the tape." (Emphasis added.)

The remainder of defendant's closing argument focused on why the court should not find the other witnesses credible, why the physical evidence was unconvincing, and why the court should be concerned about the statements Detective Ford made. The State's rebuttal argument

---

[2]*Smith v. United States*, 348 U.S. 147 (1954).

focused on the sufficiency of the evidence even if the court did not find defendant's confession to be reliable.

¶ 22 The court found defendant guilty of both murders. The court recited the various pieces of evidence on which it relied, including the testimony of Skyles and grand jury testimony of Matthews. In its finding of fact, it specifically found defendant had not been coerced, and that his words were "a clear reflection of the past. He was not making anything up." The court also found other indicia of reliability: "in regards to his age, intelligence, his background and experience, his education, the duration of the conversations and any abuse, there was no abuse. As the State has mentioned the Defendant was 19 years old at the time, he was intelligent, he was able to explain in regards to the event that occurred on those two nights exactly what happened, how things progressed from one stage to the other." The trial court's ruling contained no discussion of voluntariness.

¶ 23 Defendant filed a motion for a new trial. The motion contained a number of general claims, asserting the State failed to prove him guilty beyond a reasonable doubt, the finding was against the weight of evidence, the defendant was denied due process of law and equal protection of the laws, and the defendant did not receive a fair trial. It included approximately twenty more detailed claims, *e.g.*, "The Court erred in allowing Dorian Skyles to testify, over objection, that Joshua Stanley said he knew a guy who won $1.2 million on lottery and he wanted to rob him, and that he learned this information from the guy's nephew, Angelo" and "The Court erred in sustaining an objection to questioning of Detective Ford as to whether Cavinaugh Hughes expressed his relief to the detective when the detective removed his handcuffs." The motion also stated that "[t]he Court erred in denying defendant's Motion to Suppress statement," with no further discussion on voluntariness or the reason behind that claim.

¶ 24 At the hearing on the motion, defense counsel acknowledged the court had presided over the case recently and opted not to "go into great detail." Defense counsel asked the court to grant the motion for "each and every allegation in the motion," but particularly for the credibility problems of the State's witnesses.

> "Additional evidence in this case, Judge, was the statements Mr. Hughes made to the detective in the police station here in Chicago, and I'd ask your Honor to reconsider your ruling based on the fact that Mr. Hughes appears on the tapes that your Honor saw to be attempting to please the detective, and cooperate with him, and give him the answers that he wants. *** There were misstatements by the detective to induce him to give the statement, and based on the caliber of the civilian witnesses, all of whom had reasons to fear that they would be charged themselves, including Jetun Coleman [*sic*] who actually asserted a Fifth Amendment privilege so she would not have to testify because of her fear of being involved in this, and based on the fact that Mr. Hughes was a very young person, just a teenager, and being pressured and held all night during the time he was giving the statements, we would ask you to consider—reconsider your findings of guilty as to the two first degree murder charges. In addition, Judge, we would ask in the alternative that you grant him a new trial based on the trial error."

No additional indication was given on the record as to which trial error was referenced, but Coburn's fifth amendment privilege was among the written claims in the motion for a new trial. The State's argument focused on the strength of evidence presented and argued the court

had been correct to recognize Coburn's privilege. The trial court denied the motion for a new trial.

¶ 25    Before the appellate court, defendant argued that his confession to shooting Coleman was involuntary and should have been suppressed. Specifically, he argued he was 19 years old and had only a ninth-grade education, having gotten Cs and Ds in school. He'd had little to no sleep when he made his statement. The State provided no evidence about when Hughes had last slept before being arrested in Michigan, and he could not have slept on the way down from Michigan due to his discomfort. The videos indicated he did not sleep for any significant amount of time in the interrogation room at Area Two, and he fell asleep in the polygraph examiner's chair while she was out of the room. Further, he was susceptible to suggestion as he was suffering from severe emotional distress due to the death of his grandfather, with whom he was close. On the tape, defendant began speaking aloud to his grandfather while detectives were out of the interrogation room. Defendant was additionally the victim of deceptive and coercive police conduct, when Detective Ford falsely indicated there were numerous eyewitnesses against defendant and that the shots to Coleman's legs had been the fatal ones. Likewise, Detective Figueroa-Mitchell indicated she would testify about who passed a polygraph, and that court needed to know Hughes was sorry. Defendant also argued he was susceptible to suggestion due to his substance abuse, using marijuana five to six times a day and drinking four to five glasses of cognac twice a week. Finally, defendant pointed toward his minimal prior contact with the criminal justice system and the relentless nature of the questioning. The error of admitting his confession, defendant argued, was not harmless because the evidence was closely balanced, given the credibility problems of Skyles and Matthews. Defendant did not present any argument about his confession to shooting Stanley or whether the evidence in that case was closely balanced.

¶ 26    The State first argued defendant "should be estopped from raising this claim based upon his affirmative waiver of this issue where he did not present these reasons at his motion to suppress in the trial court." The State further argued that a reviewing court may not consider trial evidence to reverse a trial court's decision denying a motion to suppress, relying on *People v. La Bostrie*, 14 Ill. 2d 617, 620-21 (1958), and *People v. Brooks*, 187 Ill. 2d 91, 128 (1999) ("By not asking the court to reconsider its ruling on the motion to suppress when that evidence was introduced at trial, defendant has waived his right to argue it on appeal."). The State countered defendant's specific contentions on voluntariness point for point and additionally argued the evidence was not closely balanced.

¶ 27    The appellate court, with one justice dissenting, agreed with defendant. First, the appellate court held the admission of defendant's confession was not forfeited, insofar as he raised the issue of voluntariness in a motion *in limine* and a posttrial motion. 2013 IL App (1st) 110237, ¶ 42. While he raised some additional theories on appeal, the appellate court found he had raised the issue under sufficiently similar theories, citing *People v. Hyland*, 2012 IL App (1st) 110966, ¶¶ 27-28. The appellate court concluded the trial court "had every opportunity to meaningfully review and rule on the same essential claim raised on appeal, namely, involuntariness." 2013 IL App (1st) 110237, ¶ 46. The court further found that, even if it had been forfeited, the admission of defendant's confession could be reviewed under first-prong plain error, insofar as it was a clear and obvious error among otherwise balanced evidence. The appellate court reversed, finding defendant's confession involuntary due to a confluence of issues: his age and educational level (*id.* ¶¶ 56-57), being handcuffed on the ride from

Michigan (*id.* ¶ 58), his sleep deprivation and the length of interrogation (*id.* ¶¶ 59-60), food deprivation (*id.* ¶ 60), his prior substance abuse (*id.* ¶ 62), and police deception and deceptive use of polygraph results in particular (*id.* ¶¶ 72-78). The appellate majority was additionally troubled by the unbriefed and unargued issue of defendant's apparent use of cannabis while in police custody and shortly before his polygraph examination, while officers were out of the interrogation room. *Id.* ¶ 71. The appellate court concluded it was not clear that defendant's grief over his grandfather's death hampered the voluntariness of his statements. *Id.* ¶ 61. The appellate court reversed and remanded for a new trial on both the Coleman and Stanley murders, with the confessions suppressed.

¶ 28    The dissenting justice concluded these points were forfeited and rebutted point for point. The dissenting justice noted defendant filed a "boilerplate motion to suppress" urging "every ground imaginable as a basis to suppress." *Id.* ¶ 91 (Mason, J., dissenting). The dissenting justice concluded defendant did not raise the "same essential claim" on appeal and must be deemed to have forfeited those arguments. *Id.* ¶ 94. The dissenting justice concluded the majority had, by reviewing the interrogation and confessions *de novo*, wandered into fact finding, "a function incompatible with any recognized standard of review." *Id.* ¶ 97. The dissent took issue with the appellate majority's raising and deciding the unbriefed issue of defendant's marijuana use in custody and specifically contested the majority's interpretation of the video. *Id.* ¶¶ 99-115.

¶ 29    This appeal followed.

¶ 30                                  ANALYSIS

¶ 31    It is "axiomatic" that a conviction based, "in whole or in part, on an involuntary confession, regardless of its truth or falsity," violates a defendant's constitutional rights. *Miranda v. Arizona*, 384 U.S. 436, 464 n.33 (1966). "The test of voluntariness is whether the individual made his confession freely and voluntarily, without compulsion or inducement of any kind, or whether the individual's will was overborne at the time of the confession." *People v. Morgan*, 197 Ill. 2d 404, 437 (2001). Courts weighing the voluntariness of a confession consider the "totality of the circumstances," including the defendant's "age, intelligence, background, experience, education, mental capacity, and physical condition at the time of questioning," along with the duration and legality of the detention. *People v. Murdock*, 2012 IL 112362, ¶ 30. Courts also consider whether there was any physical or mental abuse, including if police made threats or promises to a defendant. *Id.* No single factor is dispositive. *Id.* The State has the burden of establishing the voluntariness of the defendant's confession by a preponderance of the evidence. *People v. Gilliam*, 172 Ill. 2d 484, 501 (1996).

¶ 32    The trial court's findings of fact in a suppression hearing will be disturbed only if they are against the manifest weight of the evidence. *Murdock*, 2012 IL 112362, ¶ 29. We review the trial court's ultimate finding on voluntariness *de novo*. *Id.*

¶ 33    This case additionally concerns arguments of waiver and forfeiture. The State contends defendant affirmatively waived those arguments raised on appeal that were not raised before the trial court. Citing *People v. McAdrian*, the State argues that parties have the right to address the arguments made by their opponents and to rely on intentional waiver when arguments are deliberately not made. *People v. McAdrian*, 52 Ill. 2d 250, 254 (1972). The State additionally analogizes to the invited error rule, wherein a party cannot complain of error that it brought

about or participated in. *People v. Villarreal*, 198 Ill. 2d 209, 227-28 (2001). The State additionally points toward our decision in *People v. White*, for the proposition that a court of review should decline to answer a question for which no adequate record has been developed due to a party's chosen strategy. *People v. White*, 2011 IL 109689, ¶ 143.

¶ 34    Defendant argues that the grounds defense counsel argued at the hearing on the motion to suppress were *additional* grounds, such that all of the original written grounds were never withdrawn. Defendant further points out that it was the State that introduced the entirety of the interrogation videos. Defendant additionally argues that a defendant need not argue identical grounds for suppression at trial and on appeal, pointing to *Hyland*, 2012 IL App 110966, ¶ 27.

¶ 35    Beyond the threshold issue of claim preservation, the State additionally argues the appellate court exceeded the scope of review in reversing defendant's conviction for the Stanley murder when defendant presented no evidence and in considering the issue of defendant's putative in-custody marijuana consumption *sua sponte*. Finally the State argues admission of defendant's confession was proper.

¶ 36    Defendant asks that if this court should conclude the appellate court exceeded the scope of review in reversing the Stanley murder conviction that it nonetheless affirm reversal of the Coleman conviction. In the alternative, defendant asks this court to remand for a new hearing on voluntariness, if we do not affirm the appellate court outright. Defendant additionally renews his appellate grounds for finding the confession involuntary.

¶ 37    We believe the State has the better view on the threshold question of claim preservation. The question is closely related to the doctrines of forfeiture and waiver. We should acknowledge that these two terms have been used interchangeably at times, particularly in the criminal context, despite representing distinct doctrines. "As this court has noted, there is a difference between waiver and forfeiture. While waiver is the voluntary relinquishment of a known right, forfeiture is the failure to timely comply with procedural requirements. [Citations.] These characterizations apply equally to criminal and civil matters. Thus, while *Sullivan* [*v. Edward Hospital*, 209 Ill. 2d 100 (2004),] spoke in terms of waiver, a party's failure to raise an issue in its petition for leave to appeal may equally be deemed a forfeiture of that issue." *Buenz v. Frontline Transportation Co.*, 227 Ill. 2d 302, 320 n.2 (2008). Whether we were to consider this question under waiver or forfeiture, a drastic change in arguments can prompt the same problems on appeal.

¶ 38    In *People v. Caballero*, this court noted the lack of judicial economy in raising forfeited issues. "Failure to raise issues in the trial court denies that court the opportunity to grant a new trial, if warranted. This casts a needless burden of preparing and processing appeals upon appellate counsel for the defense, the prosecution, and upon the court of review." *People v. Caballero*, 102 Ill. 2d 23, 31 (1984). The *Caballero* court noted the posttrial motion needed to limit consideration to errors considered significant, lest the appeal become open-ended. "Appellate counsel may comb the record for every semblance of error and raise issues on appeal whether or not trial counsel considered them of any importance. In this case, for instance, 18 issues have been raised on appeal, some of which were obviously considered insignificant by trial counsel." *Id.* at 32. This court has also previously noted how new factual theories on appeal deprive the formerly prevailing party of the opportunity to present evidence on that point. *McAdrian*, 52 Ill. 2d at 254 ("The failure to urge a particular theory before the trial court will often cause the opposing party to refrain from presenting available pertinent

rebuttal evidence on such theory, which evidence could have a positive bearing on the disposition of the case in both the trial and reviewing courts.").

¶ 39 This court has more recently recognized that a defendant's affirmative waiver of the right to challenge the admission of lineup evidence could skew the record on appeal.

"However, the circumstances surrounding the conduct of the lineup, and those leading up to it, are less clearly developed. Because defense counsel never moved to suppress the lineup identifications on grounds defendant now asserts, there was no suppression hearing; hence the State may not have adduced all available evidence bearing upon defendant's current constitutional contentions. Thus, we do not have a record equitably compiled for the purpose of addressing the attachment issue defendant actually raised in his petition for leave to appeal and in his opening brief, nor for the issue we might have to address in the event we were to find the right to counsel had attached at the time of the lineup. Neither side presented arguments applicable thereto. In sum, we are not confident that all of the evidence that could have been brought to bear on these issues was in fact adduced." *White*, 2011 IL 109689, ¶ 143.

The *White* court declined to hear that issue, in part because of the lack of a "record equitably compiled for the purpose." *Id.*

¶ 40 We find that all of these concerns motivating the doctrines of forfeiture and waiver apply with equal vigor here. Despite defendant's arguments that he is making the same claims, his reasons for suppression in the trial and appellate courts, while not factually hostile to one another, are almost wholly distinct from one another. At the suppression hearing, defense counsel acknowledged the very broadly worded motion, then stated "I just want to give notice to counsel those are the grounds we will be proceeding on." Defense counsel proceeded to present argument about defendant's handcuffs being too tight on the ride down from Michigan and whether the court might infer that detectives interviewed him without having given defendant the *Miranda* warning. Contrary to defendant's current argument that these were additional grounds for suppression, they fit entirely within the motion's claims of interrogation without the benefit of *Miranda* warnings and physical and psychological coercion being directed at defendant.

¶ 41 Further, defense counsel presented no evidence and produced no argument as to sleep deprivation, food deprivation, the defendant's education, his age, his grief at the loss of his grandfather, his lack of exposure to the criminal justice system, or his abuse of drugs and alcohol. There was minimal cross-examination about police deception, but little substantial argument. All of this information was available to defendant at the time of the suppression hearing, either through his own personal knowledge or his review of the interrogation video. Notably, defense counsel relied on the video interrogation in the suppression hearing solely for an event that occurred within minutes of its start. The State had the responsibility to show, by a preponderance of the evidence, that defendant's confession was voluntary. Defendant thereafter did not utilize the video in the hearing on the motion to suppress, and it must be presumed this was defendant's tactical choice.

¶ 42 When the State later sought to introduce video of defendant's confession in its case in chief, defendant did not renew any objection to it on the basis it was involuntary. Instead, counsel's objection focused on incompleteness, as the State introduced only individual conversations and not the entire course of interrogation. At closing argument, defense counsel

pointed to a variety of factors about the defendant and the interrogation that should make the confession suspect, but only as to the reliability of that confession. Even where a confession has been determined to be voluntary, a defendant might still attack it as unreliable. See, *e.g.*, *People v. Melock*, 149 Ill. 2d 423, 465 (1992) (holding that polygraph evidence should have been admitted for the purpose of determining the credibility and reliability of the confession where it had been ruled voluntary). Counsel conceded the confession was voluntary, repeatedly suggesting it was a "false confession voluntarily made."

¶ 43    Defendant never renewed the call for suppression of the confession until the posttrial motion. The motion for a new trial did assert that "[t]he Court erred in denying defendant's Motion to Suppress statement," but the written motion provided no further detail or argument on that point. The oral argument on the posttrial motion was, likewise, not sufficient to give the trial court any indication the intended focus was voluntariness. The oral argument stated a variety of the factors counsel had previously argued as to the unreliability of defendant's confession and asked the court to "reconsider your findings of guilty as to the two first degree murder charges." Nothing in the oral argument on the motion distinguished this as a voluntariness argument, rather than a renewal of counsel's closing argument as to reliability. The oral argument on the motion concluded by asking the court to "grant him a new trial based on the trial error." Nothing in the oral argument indicated whether "the trial error" was a particular one of the twenty specific trial errors claimed, one of the generic claims of error, or that "[t]he Court erred in denying defendant's Motion to Suppress statement."

¶ 44    Throughout the suppression hearing, the admission of the confession at trial, the closing argument, and the posttrial motion argument, nothing in the record indicates the trial court was given the opportunity to consider the bulk of these arguments that defendant's confession was involuntary. Likewise, the State was never given the opportunity to present evidence or argument that defendant's confession was voluntary even as against these challenges. To the extent defense counsel germinated the seeds of these arguments, they were against the confession's reliability. The State was never provided notice these arguments would attack the admissibility of the confession, such that the State never had an opportunity to rebut them.

¶ 45    Defendant has argued that he need not state identical grounds for contesting the issue of voluntariness, citing *Hyland*, 2012 IL App (1st) 110966, ¶ 27. *Hyland* relied on our holding in *People v. Mohr* that a defendant's posttrial argument that the State had inadequately supported a jury instruction on provocation and initial objection that the State did not back up its claim of provocation with evidence were "close enough" to preserve the issue for review. *People v. Mohr*, 228 Ill. 2d 53, 64-65 (2008). In *Hyland*, the appellate court concluded a defendant's motion to suppress based on lack of probable cause to arrest him was sufficiently similar to his posttrial motion about the investigative alert lacking probable cause. *Hyland*, 2012 IL App (1st) 110966, ¶¶ 26-27. We need not pass on whether *Hyland* was an appropriate application of *Mohr*, because defendant's contentions regarding voluntariness at trial and on appeal were almost entirely distinct. We conclude defendant did not adequately preserve these claims.

¶ 46    Because defendant failed to produce an adequate record for the appellate court to review voluntariness under these new theories, the appellate court ought not to have decided these factual issues anew. The dissenting justice below quite aptly pointed out the difficulty of discerning the appellate majority's standard of review; this was because the appellate majority was deciding new issues of fact for the first time on appeal. *Hughes*, 2013 IL App (1st) 110237,

¶ 117 (Mason, J., dissenting) (concluding "the majority engages in a detailed factual analysis of the contents of the videotape *as if* an evidentiary hearing addressing these issues had been conducted in the trial court, which, of course, it was not. Therefore, it is unclear under what standard the majority is reaching the conclusions it finds warrant reversal." (Emphasis in original.)). By declining or failing to raise these claims below, defendant deprived the State of the opportunity to challenge them with evidence of its own, he deprived the trial court of the opportunity to decide the issue on those bases, and he deprived the appellate court of an adequate record to make these determinations. To consider such claims preserved would also multiply litigation by motivating parties to address at trial all conceivable arguments that might later be made and by forcing the trial court to consider not only the arguments made by counsel, but all arguments counsel might have made.

¶ 47    Having concluded defendant did not adequately preserve these distinct claims for appeal, we find the trial court did not err in its conclusion that keeping handcuffs on defendant for the ride from Michigan and the possibility of interrogation without *Miranda* warnings did not render defendant's confession involuntary. The trial court found, as a factual matter, that Detective Ford credibly testified he had read defendant the *Miranda* warning both before and after the ride from Michigan. The trial court likewise found defendant had not been physically or psychologically coerced by the presence of handcuffs on him. Though the decision to take a rental car to pick up an out-of-state murder suspect may be questionable—given that officer safety will then require handcuffing the suspect for the duration of the ride home—we likewise do not find that it alone was sufficient to render defendant's confession involuntary. We have concluded the trial court did not err in declining to suppress defendant's confession to Elijah Coleman's murder. This conclusion applies *a fortiori* to the earlier confession to shooting Joshua Stanley, which the appellate court suppressed despite defendant having presented no argument on it there.

¶ 48    Neither party has argued the appellate court's correction of defendant's mittimus, and we leave that portion of the appellate decision undisturbed. Accordingly, we affirm the correction of the mittimus and reverse the appellate court as to the suppression of defendant's confession. The decision of the circuit court is otherwise affirmed.

¶ 49                                          CONCLUSION

¶ 50    While defendant adequately preserved the broad issue of voluntariness of his confession, his arguments on appeal are almost entirely distinct from his arguments before the trial court. The drastic shift in factual theories deprived the State of the opportunity to present evidence on them. A court of review could not be confident in the adequacy of this record to address those arguments. The judgment of the appellate court is reversed as to suppression and affirmed as to mittimus. The cause is remanded to the circuit court for issuance of a corrected mittimus giving defendant credit for his custody starting October 26, 2006, until sentencing.

¶ 51    Appellate court judgment affirmed in part and reversed in part.

¶ 52    Circuit court judgment affirmed.

¶ 53    Cause remanded.

¶ 54    JUSTICE BURKE, specially concurring:

¶ 55    I agree with the majority that the judgment of the appellate court must be reversed. I disagree, however, with the majority's analysis, which omits some necessary steps. I therefore specially concur.

¶ 56    The Majority Does Not Address the Jurisdictional Issue
Which This Court Ordered the Parties to Brief

¶ 57    Defendant was arrested for the murders of two people, Elijah Coleman and Joshua Stanley. After questioning by police officers, defendant admitted shooting Stanley. Later, after a polygraph test and further questioning, defendant gave a second confession in which he admitted shooting Coleman.

¶ 58    Defendant was charged in the circuit court of Cook County in two separate indictments. In case No. 06-CR-26159, defendant was charged with the first-degree murder of Coleman, home invasion and attempted armed robbery. In case No. 06-CR-26160, defendant was charged with the first-degree murder of Stanley. The State filed a motion to join the cases for trial, which was granted by the circuit court.

¶ 59    Prior to trial, defendant moved to suppress both of his confessions. That motion was denied. A bench trial followed. At trial, the state produced evidence which tended to show that defendant shot and killed Coleman during a home invasion and that, the next day, defendant shot and killed Stanley, who was an accomplice, to prevent him from talking about the murder of Coleman.

¶ 60    At the conclusion of the trial, defendant was convicted of all charges. He was sentenced to two terms of natural life imprisonment: one term for the murder of Coleman and one term for the murder of Stanley.

¶ 61    On appeal, defendant did not challenge the circuit court's order denying his motion to suppress his confession that he shot Stanley (2013 IL App (1st) 110237, ¶ 1), and the appellate court did not discuss that confession.[3] However, the appellate court concluded that defendant's confession that he shot Coleman was involuntary (*id.* ¶¶ 80-81) and, therefore, the circuit court erred in admitting that confession into evidence. The appellate court reversed defendant's conviction for the murder of Coleman[4] and remanded for a new trial. We granted the State's petition for leave to appeal.

---

[3]The majority states that the appellate court ordered the suppression of defendant's confession that he shot Stanley. *Supra* ¶ 47. This is incorrect. The appellate court never addressed the admissibility of defendant's first confession and never ordered its suppression. In fact, the appellate court expressly stated that "[Defendant] killed Stanley." 2013 IL App (1st) 110237, ¶ 82.

[4]The appellate court's disposition of the Stanley case, No. 06-CR-26160, is unclear. On the one hand, the judgment of the appellate court was simply to "reverse and remand for a new trial." 2013 IL App (1st) 110237, ¶ 83. Without further elaboration, this would suggest that the appellate court intended to reverse both of defendant's convictions. On the other hand, the appellate court never suppressed, or even discussed, defendant's confession that he shot Stanley and, as noted previously, the court stated that "[Defendant] killed Stanley." *Id.* ¶ 82. This makes it difficult to conclude that the appellate court meant to reverse defendant's conviction for murdering Stanley but, instead, may have intended only to reverse the Coleman conviction. In any event, because this court holds that both of defendant's convictions must be affirmed, it is not necessary to explore this further.

¶ 62    After initial briefing was completed in this court, and before oral argument, this court ordered the parties to provide additional briefing on an issue affecting the jurisdiction of the appellate court. The caption at the top of the notice of appeal to the appellate court contained the case No. 06-CR-26160, the number for the Stanley case. The notice of appeal thereby vested the appellate court with jurisdiction over the judgment of conviction rendered against defendant for the murder of Stanley. However, the caption to the notice of appeal did not contain the number for the Coleman case, No. 06-CR-26159.

¶ 63    In the appellate court, defendant's appellant counsel sought, and the appellate court granted, an order amending the notice of appeal to add the number of the Coleman case. However, the request to amend the notice of appeal was filed some 15 months after the notice was filed, well beyond the time for amending a notice of appeal permitted under our rules. See Ill. S. Ct. R. 606(b), (c), (d) (eff. Dec. 11, 2014); R. 303(b)(5) (eff. Jan. 1, 2015). This court's order to the parties for additional briefing directed them to address whether the notice of appeal was sufficient to vest the appellate court with jurisdiction over both cases.

¶ 64    Oddly, the majority says nothing about this issue. This is clearly error. If an issue is of such importance to the proceedings that the parties must be *ordered* to submit additional briefing, then surely it is a matter that must be addressed by this court. This is particularly true here since the issue is one of jurisdiction and determining whether the appellate court had jurisdiction is a necessary first step to our reviewing the merits of the appellate court's decision.

¶ 65    I would address the jurisdictional issue. I would hold that the notice of appeal was sufficient to vest the appellate court with jurisdiction over the judgments of conviction in both cases.

¶ 66    The purpose of a notice of appeal is to inform the party prevailing in the circuit court that the unsuccessful party seeks review of the judgment. *People v. Smith*, 228 Ill. 2d 95, 104 (2008). The notice is to be construed liberally. *Id.* The notice of appeal " 'should be considered as a whole and will be deemed sufficient to confer jurisdiction on an appellate court when it fairly and adequately sets out the judgment complained of and the relief sought, thus advising the successful litigant of the nature of the appeal.' [Citation.] 'Where the deficiency in notice is one of form, rather than substance, and the appellee is not prejudiced, the failure to comply strictly with the form of notice is not fatal.' [Citation.]" *Id.* at 105.

¶ 67    Here, while the caption to the notice of appeal did not contain the number of the Coleman case, the body of the notice stated that defendant was appealing "OFFENSES: FIRST DEGREE MURDER." The body of the appeal further indicated that defendant received two sentences of life imprisonment ("LIFE IMPRISONMENT (2)") for those first-degree murder convictions. Thus, not only were the cases tried jointly at the State's request, but the body of the notice of appeal explicitly provided that defendant was appealing multiple offenses of first-degree murder, thereby necessarily encompassing both cases, and the notice stated that defendant was appealing the convictions resulting in his two life sentences. Subsequent proceedings in the appellate court also made it clear that defendant was appealing the Coleman case. Moreover, the State, in its additional briefing in this court, has acknowledged that it understood defendant to be appealing both cases and that it was not prejudiced in any way by the omission of the Coleman case number in the caption of the notice of appeal. Under these circumstances, I would find the notice of appeal sufficient. See, *e.g.*, *People v. Bennett*, 144 Ill. App. 3d 184, 185 (1986) (jurisdiction found where *pro se* notice of appeal contained the wrong

case number but the body of the notice referred to the correct case). Accordingly, I would hold that the appellate court had jurisdiction over both cases, and, therefore, we may address the merits of the appellate court's decision.

¶ 68                                     The Majority Does Not Address Defendant's
                                                Plain Error Argument

¶ 69         The appellate court held that defendant's confession that he shot Coleman was involuntary based upon defendant's character, which included his age, education and experience with the criminal justice system, defendant's physical condition, in that he was "visibly spent" and "drug-addled" at the time of the confession, and police "trickery." 2013 IL App (1st) 110237, ¶ 80. Before this court, the State points out that the only arguments offered by defendant in support of his motion to suppress were that, during transport from a Michigan jail to a jail in Chicago, the police (1) improperly questioned him without the benefit of an electronic recording; (2) failed to read him his *Miranda* rights; and (3) handcuffed him in an uncomfortable manner. The State further notes that at trial, defendant did not renew his claim of involuntariness. Instead, defendant argued only that his confession was unreliable. Therefore, according to the State, defendant abandoned any claim that his confession was involuntary on the grounds relied upon by the appellate court and the court erred in ordering that the confession be suppressed.

¶ 70         Defendant, in response, contends that his claims were properly preserved. In the alternative, defendant maintains that, even if they were not, the admission of his confession that he shot Coleman was plain error. Therefore, defendant contends, the appellate court was correct to find his confession involuntary.

¶ 71         The majority holds that defendant "did not adequately preserve" his claims that the Coleman confession was involuntary on the grounds relied upon by the appellate court. *Supra* ¶ 45. However, the majority never addresses defendant's alternative argument, *i.e.*, that even if those claims were not adequately preserved, there was, nevertheless, plain error. This is a critical omission. The appellate court's judgment can only be reversed if defendant's plain error argument is incorrect. If defendant is, in fact, correct, and there is plain error, then the judgment of the appellate court reversing defendant's conviction for the murder of Coleman must be affirmed. It is necessary, therefore, to address defendant's plain error argument.

¶ 72         I would reject defendant's contention that the admission of his confession to shooting Coleman was plain error. Justice Mason, writing in dissent in the appellate court, persuasively explained why there was no error in the admission of defendant's confession and, therefore, no plain error. I would adopt the reasoning of Justice Mason's dissent *in toto* and incorporate it herein.

¶ 73         For the foregoing reasons, I specially concur.

¶ 74         JUSTICES THOMAS and KILBRIDE join in this special concurrence.